## Harnish v. Shannon

*Chaplin & Arnold,* for plaintiffs.

*Thorp, Reed & Armstrong,* for defendants.

SNYDER, P. J., September 21, 1957.—This is a bill in equity for an accounting of royalties under a coal lease. The matter is presently before the court on motions of defendants and plaintiffs for judgment on the pleadings under rule 1034 of the Rules of Civil Procedure governing actions in equity.

The pleadings consist of a bill of complaint, answer and motions for judgment on the pleadings.

The question now before the court is whether either of the motions for judgment on the pleadings should be granted. Under the general rule, we are bound to accept the averments of facts in the complaint as being true. Actually, there is no dispute as to the facts. The outcome of the case hinges upon determination of the

rights of the parties under the terms of a coal lease between them as affected by the terms of a coal lease from defendants to their transferee and an award of a board of arbitrators relative thereto.

On March 26, 1945, plaintiffs by an agreement in writing leased to defendants all of the mineable and merchantable coal in the Fulton and Barnett seams underlying a certain tract of land situate in Bedford County, containing 458 acres. Said lease provides in part, as follows:

"This lease shall take effect as of April 1, 1945, and continue until the exhaustion of all the mineable and merchantable coal contained in the said seams of coal underlying the described land.

"The said Lessees agree to and with the said Lessors that they shall, as further consideration for this contract, pay as royalty to the said Lessors, their successors, administrators, executors, heirs or assigns, the sum of eight cents (8¢) per ton of two thousand pounds weight on all coal which in the opinion of the Lessees is merchantable and mineable and which they mine and ship from said premises during the continuance of this lease. The payments of royalty are to be made on or before the 25th day of each month for said coal mined and shipped during the previous month, payment shall be accompanied by a correct statement and account of all coal mined and shipped from the said leased premises.

"There shall be no rental payable by the Lessees to the Lessors for the first year of the term of the lease ensuing April 1, 1945; but for three (3) years ensuing April 1, 1945, the Lessees shall pay to the Lessors a rental of Twenty-Five Hundred ($2500.00) Dollars per annum, payable for each year on or before the 20th day of December of the current year. It is contemplated by and betwen the parties that the mining

operations of the Lessees, and their assigns, will not have reached or extended into the hereby leased premises until the expiration of a three (3) year period from April 1, 1946; but if the said Lessees, or their sublessees or assigns, shall within said three (3) year period extend their mining operations into the leased premises sooner than expected they will, for any coal mined in said period, pay the stipulated royalty thereon without credit or deduction for any amount paid or payable as rental by the Lessees to the Lessors. During the remainder of the term of the lease the Lessees shall not be liable to the Lessors for rent, but shall be liable only for royalty on coal actually mined; nor shall the Lessees be liable to the Lessors under any of the express terms and conditions of this lease, or by implication therefrom, for failure to make or prosecute mining operatings with diligence, it being understood that the Lessees, and their assigns, shall not be required to mine any prescribed quantity of coal from the leased premises, but after having extended their mining operatings to the leased premises, or ceased advancing their operations in that direction, this lease shall, at the option of the Lessors, be taken and treated as terminated if the Lessees and their assigns shall not during any annual period of the lease mine or pay royalty on sufficient coal to pay the taxes becoming due and payable upon the said demised premises; provided ninety (90) days' notice be given in writing to the Lessees of intention of the Lessors to terminate the lease if mining is not commenced or resumed, or sufficient royalty be not paid to meet current taxes, before the expiration of the said notice period.

"The parties hereto covenant and agree that in case of any breech by the Lessees of any of the covenants contained in this agreement, the Lessors shall notify the Lessees thereof by proper notice in writing, sent

by registered mail to the Lessees at their herein given Post Office address and if the Lessees shall fail to correct or remedy the same within ninety (90) days thereafter, this agreement shall terminate and it shall be lawful for the Lessors, their successors, administrators, executors and/or assigns, at their option, to enter in and upon the premises as for conditions broken and repossess themselves of their former estate. The above remedy shall be considered cumulative to any other remedy·the Lessors may have at law or in equity for the collection of rental and royalty due under the terms of this agreement.

"This agreement shall inure to the benefit of the heirs, administrators, executors, and/or assigns of the Lessors and to the sublessees, successors and/or assigns of the Lessees."

On December 3, 1943, defendants by an agreement in writing leased to the Pennsylvania Edison Company all of the unmined and practically mineable and merchantable coal in the Fulton and Barnett seams underlying certain tracts of land situate in Bedford and Huntingdon Counties. Said lease provides, inter alia, as follows:

"And if the lessors acquire by deed, lease or otherwise, within a period of five years from the date of this lease, the coal underlying certain tracts or parts of tracts known to the parties hereto as the Gould, Everett-Saxton Company, Harnish,—formerly Broad Top Coal Company, Roch Hill Coal and Iron Company and Shannon tracts or parts of tracts of land, the same, without further contract or designation herein than formal written notice by lessors to the lessee of such acquisition shall be added to and considered as part of the herein leased lands and premises.

"The lessee shall pay to the lessors for said coal and mining rights and privileges herein leased a royalty

of fifteen (15¢) cents for each and every net ton of 2,000 pounds weight of merchantable coal mined and removed from or used by it on the leased premises. Said royalty to be paid monthly without further demand not later than the twenty-fifth day of each month for all coal mined and removed from or used upon the premises during the preceding month.

"The Lessee shall during each month of the first nine months of the lease term beginning October first, 1943, pay royalty to the lessors on the amount of coal actually mined and removed; and during each quarter yearly period of the year beginning July first, 1944, the lessee shall mine or pay royalties on the same as if mined and removed not less than 10,000 net tons of coal; and during each quarter yearly period of the year beginning July first, 1945, the leasee shall mine or pay royalty on the same as if mined or removed, not less than 20,000 net tons of coal; and the lessee shall mine and remove or pay royalty on the same as if mined and removed in each quarter yearly period of the remainder of the term of the lease beginning July first, 1946, not less that 31,250 net tons of coal."

On or about June 15, 1953, the Pennsylvania Edison Company abandoned its coal operations on the ground that all the merchantable and mineable coal had been removed from the lands under lease from defendants. Subsequently, defendants instituted an action against said company in the Court of Common Pleas of Bedford County to no. 110, February term, 1954, for the appointment of arbitrators under the provisions of their lease to determine how much, if any, practicably mineable and merchantable coal remained in the leased premises and the extent of the liability of the company under the provisions of their lease for payment of the minimum royalty on such coal, if any. On April 29, 1955, the arbitrators filed their award which was

subsequently confirmed by the court at the request of all parties to the suit.

The arbitrators found as a fact that the total acreage covered by the lease from defendants to the Pennsylvania Edison Company is 1,405.63 acres and that the tract of 458 acres leased by plaintiffs to defendants was rightfully included therein, that there remain unmined in the total acreage of 1,405.63 acres, 2,330,500 net tons of practicably mineable and merchantable coal. They found as a conclusion of law that said company was obligated under the terms of the lease between defendants and the company to resume payment, as of July 1, 1953, to defendants of the minimum royalty provided for in said lease of $.15 per net ton of 2,000 pounds, on 31,250 tons per quarter, until it has paid for the 2,330,500 tons of mineable and merchantable coal and that upon payment of the full royalty on said amount of coal, the company should be under no further obligation to pay royalty to defendants until such quantity of coal shall have been removed from the leased premises of the company.

Plaintiffs aver that more than 1/3 of the 2,330,500 tons of coal for which the said company has been ordered to pay defendants, is coal underlying the tract of land leased by plaintiffs to defendants and that defendants, although they have been receiving a minimum royalty of $.15 per ton quarterly, as per the award, since July 1, 1953, have failed to pay to plaintiffs the sum of $.08 per ton on their proportionate share of the coal.

Specifically, plaintiffs ask for an accounting from defendants for that portion of 2,330,500 tons of coal which underlie the lands leased by plaintiffs to defendants at the rate of $.08 per net ton, for a money judgment against defendant at the rate of $.08 per net ton for each ton of coal for which the company has

paid defendants, in such proportionate amount as the tonnage underlying the tract owned by plaintiffs bears to the total sum of 2,330,500 tons for which the company has paid defendants from July 1, 1953, to the date of judgment herein and an order directing defendants to pay to plaintiffs the sum of $.08 per net ton on all future payments which defendants receive from the company on said proportionage tonnage.

Defendants deny the arbitrators found that there was any coal under the Harnish tract of 458 acres. However, the records show that the Harnish tract was included in defendants' lease with the company only after strenuous effort on the part of defendants, and the award clearly bases the estimated amount of practicably mineable and merchantable coal remaining in the leased premises upon a total acreage of 1,405.63 acres which includes the 458 acre tract. In any event, we need not determine whether or not there is any coal in the Harnish tract at this time. The real question raised by defendants concerns the right of plaintiffs to an immediate payment of royalties.

This is a suit by a landlord against his tenant. Their relationship is contractual. Their rights, duties and remedies and the extent thereof are to be found within the borders of their contract, in this instance, a written lease. If those rights, duties and remedies are to be extended, the burden is on the party so claiming to show a right to such extension either by some specific provisions of the original contract, by provisions of a subsequent contract or by implication. Under the terms of the lease-contract between plaintiffs and defendants we find that plaintiffs were entitled to receive $.08 per ton royalty on all coal *mined and shipped* from the premises. It is admitted that no coal has been mined and/or shipped from the premises by defendants, their assigns or sublessees. The lease

makes no provision for the payment of a minimum royalty other than a royalty sufficient to pay the taxes becoming due. In fact, defendants are specifically released from the necessity of mining any coal on the premises during the continuation of the lease.

Furthermore, defendants received the right to assign the lease or sublet the premises without the consent of plaintiffs and without the necessity of making any provision in the sublease for payment of plaintiffs' royalties. Defendants were bound by the terms of their contract with plaintiffs but the latter cannot complain if within the scope of those terms defendants have been able to negotiate a transfer that is profitable to them. It is true that defendants are being paid royalties on coal that is not being mined, under the terms of defendants' sublease with the company, and the amount of coal for which minimum royalties will be paid in the future may include an amount estimated to underlay plaintiffs' land, yet it does not behoove plaintiffs to complain. The right to participate in these royalties was not provided for under the terms of their lease nor was it provided for under the terms of defendants' transfer to their assignees or sublessees. Moreover, there was no implied obligation upon defendants to make provision therefor. It has been said that parties sui juris bind themselves by their lawful contracts, and courts cannot alter them because they work a hardship: Corona Coal and Coke Co. v. Dickinson, 261 Pa. 589, 592. The mere fact that the parties have made an improvident bargain will not lead a court to make unnatural implications or artificial interpretations. The court will not under the guise of interpretation write a new contract for the parties: Williston on Contracts, Revised Edition, 1936, vol. 3, §620, p. 1788. See also McRoberts v. Burns, 371 Pa. 129; Moore v. Stevens Coal Co., 315 Pa. 564.

Plaintiffs maintain that the covenants for the payment of a minimum royalty contained in the lease agreement between defendants and the company ran with the land so as to benefit plaintiffs, although there is no provision to this effect in the lease or the sublease. This is a most ingenuous claim which plaintiffs make no pretense of supporting with logic or precedent. The covenants contained in the lease between defendants and the company did not inure to the benefit of plaintiffs in the absence of any agreement to that effect, nor were the rights of plaintiffs or the obligations of defendants as limited by the terms of their lease enlarged by the covenants contained in the sublease, or merged therein. Furthermore, the time within which plaintiffs were entitled to the payment of royalties under the terms of their lease was not accelerated by the covenant to pay minimum royalties contained in the subsequent transfer, whether it be an assignment or a sublease. Under plaintiffs' lease, royalties were to be paid as and when the coal was mined and removed. The assignee or sublessee could not be forced by plaintiffs to pay any royalties to them until that time, regardless of the fact that they may have bound themselves to pay minimum royalties to defendants or to some other person prior to removal of the coal. It is conceivable that they might elect to abandon mining operations without removing any coal. They could do so without penalty so far as plaintiffs are concerned. If the time of payment was not accelerated as against them it is difficult to see how it would be accelerated as against defendants.

Plaintiffs claim that by virtue of the arbitration proceedings defendants brought about an involuntary sale of plaintiffs' coal to the company which was free and clear of the covenant or obligation to pay plaintiffs a royalty of $.08 per net ton and, therefore, plain-

tiffs now have an election of remedies. They say that they have the right to sue either defendants or the company, and they have elected to sue defendants rather than the company, the innocent purchaser. In the same breath, they admit defendants had the right to assign their lease. Plaintiffs' position is untenable. If defendants had the right to assign or sublet, which they undoubtedly had, they had the right to enforce the terms of the assignment or sublease. The effect of the finding of the arbitrators that the Harnish coal was subject to the terms of the lease between defendants and the company was nothing more than an interpretation and confirmation of the provisions of that lease. It did nothing to destroy or disturb the covenants of either lease. Plaintiffs were entitled to payment of royalties under the terms of their lease and that right is unaffected by the arbitration proceedings. It is well settled in this State that a lease of coal in place until such time as all of the available merchantable coal shall have been mined and removed is a sale of an estate in fee simple and leaves the lessor with only an interest in the royalties to be paid him under that lease: Smith v. Glen Alden Coal Co., 347 Pa. 290, 298; Robinson v. Pierce, 278 Pa. 372. Plaintiffs' lease, itself, constituted a sale of the coal in place, and by its terms defendants, lessees therein, were given the unqualified right to assign or sublet.

Plaintiffs have requested the court to impose a constructive trust upon the moneys presently being received by defendants from the company in payment of the minimum royalties provided for in the lease between defendants and the company. If this can be done, it must be justified upon one or the other of two theories. It must appear that plaintiffs are entitled to a proportionate share of the minimum royalties, or that a fund should be set up to guarantee payment of

the $.08 per ton royalty if and when the coal is actually mined and shipped. We believe that plaintiffs are not entitled to a constructive trust on either theory. In addition to the above reasons for holding that plaintiffs are not entitled to any part of the minimum royalties, there is nothing to indicate the intention of defendants or of the company that the $.15 per ton royalty provided for in their lease should include payment of the $.08 per ton royalty provided for in plaintiffs' lease. As to the second theory, if plaintiffs desired additional security for payment of their royalties, they could and should have made provision therefor in their lease. By its terms they agreed to look to their lessees and their assigns for payments of their royalties as and when the coal might be mined and shipped. Their own covenant is their security. It is all they provided for and the court in the exercise of its equitable powers may not increase it.

We conclude that in a suit by plaintiffs (landlords) against defendants (lessees), the rights and obligations of the parties are determined by the provisions of their own lease-contract, and, under a covenant providing for payment of royalties only after coal is mined and shipped, plaintiffs may not enforce payment until the coal is mined and shipped. Neither an assignment of the lease nor a subletting of the premises will affect the rights and obligations of the parties in the absence of a specific provision to that effect contained in the assignment or sublease.

And now, September 21, 1957, for the reasons above set forth, plaintiffs' motion for judgment on the pleadings is overruled, defendants' motion is allowed and judgment is now entered in favor of defendants.