## Commonwealth v. Griesing et al.

574

*Mitchell Jenkins*, assistant district attorney, and *Arthur H. James*, for Commonwealth. .

*M. F. McDonald* and *S. W. Rhoads*, for defendants.

VALENTINE, P. J., December 4, 1945.—Defendants, Herbert C. Griesing, James C. Gardiner and Charles Neyhard, are, respectively, superintendent, mine foreman and assistant mine foreman of the Henry Colliery, owned and operated by the Lehigh Valley Coal Company, and were such on August 2, 1945, on which date an explosion occurred at the face of chamber 23 in the Upper Baltimore vein of the mine connected with said colliery.

Defendants are charged with having violated certain mandatory provisions of the Anthracite Mine Act of June 2, 1891, P. L. 176, 52 PS §71, and under section 1, article XVII of said act, it becomes our duty to determine whether defendants, or any of them, have "been negligently guilty of an offense against the provisions of this act". Violations of the act are designated misdemeanors. Defendants are, therefore, charged with a criminal offense, and to warrant their conviction the evidence must establish the fact of guilt beyond a reasonable doubt. In seeking the answer to the guilt or innocence of defendants, this fundamental requirement must be kept in mind.

The charge against Griesing is that he failed to perform mandatory duties required by the following provisions of the act:

Article X, sec. 10 (as amended by Act of April 20, 1899, P. L. 65). "All main doors shall have an attendant whose constant duty it shall be to open them for transportation and travel and prevent them from

standing open longer than is necessary for persons or cars to pass through, unless a self-acting door is used which is approved by the inspector of the district."

Article X, sec. 11. "All main doors shall be so placed that when one door is open, another, which has the same effect upon the same current, shall be and remain closed and thus prevent any temporary stoppage of the air current."

Article X, sec. 12. "An extra main door shall be so placed and kept standing open, as to be out of reach of accident, and so fixed that it can be at once closed in the event of an accident to the doors in use."

Article X, sec. 13. "The frame work of such main doors shall be substantially secured in stone or brick, laid in mortar or cement unless otherwise permitted in writing by the inspector."

The Commonwealth asserts, that by reason of defendant Griesing's failure to comply with these provisions of the act an adequate supply of pure air was not provided as required by article X, sec. 1, of the act, which stipulates that "The owner, operator or superintendent of every mine shall provide and maintain a constant and adequate supply of pure air . . ."

The contention of the Commonwealth is that the door located on Road 265, between chambers 20 and 21, is a main door; also that there should have been another "main door" on the gangway between chambers 22 and 23.

Defendants deny both these assertions and have presented evidence tending to establish that although the door between chambers 20 and 21 was a door affecting ventilation, constructed as required by article X, sec. 9, of the act, which provides: "All doors used in assisting or in any way affecting the ventilation shall be so hung and adjusted that they will close automatically", it was in no sense a main door.

At the time of the accident no attendant was on duty at said door, and if the door was a main door, the re-

quirement of the act was not complied with. The mine act does not define a main door. This feature of the case bears a close analogy to Commonwealth v. Reynolds, 1 Kulp 223, wherein defendant was charged with having violated a section of the Mine Act of March 3, 1870, P. L. 3, by failing to have an attendant at a main door. As Judge Rice there said, so it may be said here "whether or not this was a main door or a check door is almost purely a question of fact about which there is a conflict of testimony".

Mine Inspectors John D. Edwards, Thomas M. Beaney, Daniel H. Connolly, and Edwin C. Curtis testified that the door between chambers 20 and 21 was a "main door".

The testimony of these witnesses is contradicted by a number of witnesses called on behalf of the defendant, viz., John E. Thomas, who has been familiar with anthracite mining for over 60 years; William B. Geise, a mining engineer of wide experience; John H. Pritchard, whose experience with anthracite mining also covers 60 years; William D. Thomas, whose employment in the mines of Great Britian and the United States extended over 53 years, and Charles E. Enzian, a graduate engineer with wide experience in both bituminous and anthracite coal fields. These witnesses all testified that the method of mining and the set-up concerning the circulation of air as it existed in the Upper Baltimore vein of the defendant's mine at the time of the explosion, was the usual and ordinary method used in the mining of anthracite coal, and that the door between chambers 20 and 21 was not a "main door", but a deflecting or check-door.

A number of the witnesses gave the definition of a main door, as they understood it. Edwards said a main door "is one, if left open or removed, will short cut the air to a portion or section of the mine". Beaney defined a main door set-up as "doors that are required to adequately ventilate a section of a mine". Connolly said "a main door is one that if it is left open or removed

will destroy the ventilation in a mine or the section of a mine in which it is located. In other words, a main door is a door that if left open will interrupt a constant supply of air to the faces of the working places". Curtis defined a main door as "one, which if left open, removed or destroyed, affects the ventilation in a portion or section of a mine by allowing the air to be short circuited from its prescribed course to the return".

The witnesses for defendants disagreed with these definitions. John E. Thomas testified that "a main door is a series of three doors permanently constructed and placed between the inlet and return entries on the haulageway and gangway to prevent a short cutting of the ventilating current of the different splits of the mine". Geise said: "Main doors are constructed as really a series of three doors; they are constructed per-manently between the main air intake, which is usually the haulageway, and the return to prevent any short circuit of different splits of air to different sections of the mine." Pritchard testified that a "main door set-up under the anthracite mine law must be a series of three doors, set in masonry to provide an absolute air lock, with two doors always in use, with the third door in place as a spare. Each of the two doors in use at all times must act upon the same air current, in the same way, regardless of whether or not one of them is open". William D. Thomas testified: "Main doors are a series of three doors, permanently constructed between the intake and the return, to prevent the short circuiting of the air between one split and another." Enzian testified: "The main door set-up as it is understood . . . is a series or a group of doors—in Pennsylvania it is required to be three. . . . The purpose of these main doors is to, first of all, establish a perfectly secure air lock which will prevent any interfering with the ventilation of the workings on the inside of these main doors." Defendant Griesing said: "Main doors are set in pairs and with an extra door and they form a

positive air-lock so that either one of the three doors shall have the same effect on the same air."

The four mine inspectors, called by the Commonwealth, further testified that another (main) door should have been constructed on the gangway between chambers 22 and 23. The conclusion expressed by them is strenuously denied by the five experienced and capable mining engineers, or experts, called by defendants, all of whom said that prior to the explosion the condition in the mine, as to the circulation of air, was usual and proper and that there was no necessity for the construction of an additional door.

On the date of the accident the air current was interfered with by the check door between chamber 22 and the gangway being held open by a trip of cars, which the motor-runner left standing in the doorway. The motor-runner testified that the cars could have been moved beyond the door, although such action would have caused some inconvenience, as the track was upgrade. The condition inside the mine, now complained of, had existed for sometime prior to the accident and no trouble had been experienced. The testimony shows that work in this section of the mine was started in October 1944, and there is nothing to indicate that any complaint was made by the mine inspector, or that any suggestions were offered relative to a change in the method of operation.

The testimony of the witnesses for defendants that the method of mining, as it existed at the time of the explosion, was the usual and ordinary method of mining of anthracite coal, has not been substantially contradicted. The set-up as it existed in the mine at the time of the accident conforms, almost precisely, to that outlined by Beard in his work "Mine Gases and Ventilation" which all of the witnesses concede is a standard work on this subject.

It seems clear that the direct cause of this accident was the leaving of the door at chamber 22 open. This

theory finds additional support in the fact that the mine inspector, familiar with the condition of the mine, suggested no change until after the happening of the accident. Concededly, the door between chamber 22 and the gangway was not a "main door", yet leaving it open seriously interfered with the air current. It would seem, therefore, that the result occasioned by leaving a door, which affects ventilation, open, would not determine whether the door was a main door or a check or deflecting door. The action of the motor-runner in opening the ventilating door at chamber 22, and failing to close the same, was a violation of rule 25 of article XII of the mine act, which provides: "Any person or persons who shall . . . open a ventilating door and not have the same closed . . . shall be guilty of an offense against this act." Had there been an attendant on duty at the door between chambers 20 and 21, as the Commonwealth asserts there should have been, the accident would not have been avoided, as it clearly resulted from the check-door being held open. There is nothing in the mine act indicating where, or under what circumstances an "extra main door" should be constructed, nor is there anything in the testimony indicating that the superintendent had been directed to construct any such door until after the explosion. The additional door which the mine inspector then directed the defendant officials to construct probably created an improvement in the ventilation of the mine, but obviously the manner of its construction demonstrates that it was not an extra main door as referred to in sections 12 and 13 of article X of the mine law. The fact that no additional door had been erected prior to the accident, and that one was erected subsequent thereto, cannot be regarded as an indication that the superintendent violated any section of the mine act. If the construction of an additional door was deemed necessary, the mine inspector might properly have seen that the same was erected. Precautions taken after the

happening of an accident, to prevent a re-occurrence, are no evidence of negligence, Seeherman v. Wilkes-Barre Co., 255 Pa. 11, much less a violation of the mandatory provisions of a statute.

If "main doors" had been constructed on Road 265, as some Commonwealth witnesses suggest should have been done, live or working chambers would be located between them. We do not believe the mine act contemplates the creation of such a situation, nor do we think that "main doors" are temporary structures, but rather that they are of permanent construction and are located on the haulageways or gangways and designed to act upon the same current of air.

In view of the contradictory opinions expressed by the various experts as to the type of door which was without an attendant, and also as to the necessity for the construction of an additional door, it is very difficult for any fact finding tribunal to conclude (in a case in which guilt must be proved beyond a reasonable doubt), that the burden of establishing that the door between chambers 20 and 21 on the gangway was, in fact, a main door, has been met, or that the failure to construct an additional door was a violation of the act.

If the door between chambers 20 and 21 was a main door, it was not constructed as required by section 13, art. X, of the mine law. The fact that it was not substantially secured in stone or brick, laid in mortar or cement, and that the inspector did not, in writing, permit it to be otherwise constructed, supports defendants' assertion that the door was not a main door. So also, the fact that no objection to the set-up was made by the mine inspector, bears out defendants' contention that no additional door was required in order that the provisions of the mine act should be complied with.

We conclude, therefore, that the burden of showing that defendant Griesing violated sections 10, 11, 12, and 13 of article X of the mine act, or any of said sections, has not been established.

There remain for consideration the charges against the other two defendants, Gardiner, the mine foreman, and Neyhard, the assistant foreman.

The Commonwealth charges that these two defendants violated Rule 4, article XII, of the mine act, in that they failed to make weekly examinations of all the accessible parts of the Lower Baltimore vein, which was an abandoned portion of the mine. This rule provides:

"All accessible parts of an abandoned portion of a mine in which explosive gases have been found, shall be carefully examined by the mine foreman or his assistants at least once a week, and all danger found existing therein shall be immediately removed. A report of said examination shall be recorded in a book kept at the colliery for that purpose and signed by the person making the same."

The facts bearing on this branch of the case are not controverted. The Lower Baltimore vein has been an abandoned portion of the mine for many years. Gas was found in an inaccessible portion of the vein in July 1942, at a point approximately one half a mile distant from a point underlying the place of the explosion on August 2, 1945. At the time gas was then discovered, a counter-gangway, known as Road 367, was being driven and an opening was inadvertently made into the abandoned inaccessible workings of the vein. Again, in February 1944, while driving through a second chain pillar, gas was encountered in the same way in the inaccessible portion of said vein. During the period the workings continued as live workings, daily inspections for gas were made. Thereafter defendant Gardiner made periodic inspections of the accessible portions of said vein every five or six weeks. No gas had been found in the accessible portions of said vein at any time prior to the explosion of August 2, 1945. Whether the gas, which was then ignited, came from the Lower Baltimore vein is a disputed fact.

The Commonwealth contends that as gas had been found in the Lower Baltimore vein, all accessible parts of the vein should have been examined at least once a week. On the other hand, defendants construe the rule under consideration as requiring an inspection if, and only if, gas had been found in the "accessible parts" of said vein, and assert that as no gas had, at any time, been found in such "accessible parts" of the vein, the failure to make weekly inspections was not a violation of the act. Commonwealth's counsel construe the word "mine", used in rule 4 of article XII, as "including every operation and working used for the purpose of mining coal": Moore et ux. v. Stevens Coal Co., 315 Pa. 564-66. We think that the word "mine", as used in rule 4, must be given a much more restricted meaning. In Commonwealth v. Hutchison, 4 Pa. C. C. 18, it was held that if a vein of coal was known to generate explosive gases, *any mine in that vein* will be considered a "mine generating explosive gases" which requires a daily examination.

The language of rule 4 is peculiar. Had the legislature used language similar to that contained in rule 5, of the same article, and provided: "In mines where explosive gases have been found, all accessible parts of the abandoned portion thereof shall be carefully examined", the contention of the Commonwealth would clearly be correct, but the legislature did not use this language.

From a grammatical viewpoint there can be no doubt that the construction contended for by defendants is correct. The rule directs weekly examinations of "the accessible parts" of the abandoned portion of a mine. "Parts" is the subject of the verb "shall be examined", and "mine" is the object of the preposition "of". The intent and meaning of the legislature must be determined primarily from the statute itself, and not from conjectures aliunde: Reitz v. Sinking Fund Commission of Jefferson County, 315 Pa. 87.

The words of the rule are, we think, plainly expressive of an intent, and they are not to be departed from even though the court might be of the opinion that a different provision, such as is contained in rule 5, would more effectually accomplish the general purpose which the legislature had in view in passing the Anthracite Mine Act: Keim's License, 59 Pa. Superior Ct. 631.

Assuming that the language might bear the construction contended for by the Commonwealth, we must not overlook the fact that this is a criminal prosecution, and that the defendants are not to be convicted for an honest error of judgment which does not involve a clear violation of the act.

As expressed by Judge Fuller in Commonwealth v. Steele et al., 850, September sessions, 1908:

"The persons charged (with a violation of the mine law) must be proved negligently guilty of an offense against the provisions of the Act.

"It is not enough to prove a mere violation of law.

"The violation must be negligent.

"Of course, the law would impute negligence to a violation which is deliberate, ignorant or unaccompanied with the exercise of honest judgment, but the law does not impute negligence to a violation which is not committed deliberately or ignorantly, but only through an error of judgment after an honest and vigilant exercise of that faculty.

"The beneficent purpose of this act should not be frustrated by drawing fine distinctions, but we cannot believe that the act intended to inflict criminal punishment upon honest errors of judgment."

Where a penal statute contains such an ambiguity as to leave a reasonable doubt of its meaning, it is the duty of the court not to inflict the penalty: Commonwealth v. West Philadelphia Fidelio Mannerchor, 115 Pa. Superior Ct. 241.

We are, therefore, constrained to the conclusion that the construction of rule 4 of article XII, contended for by defendants is the proper and reasonable construc-

584

tion of the unmistakable language used by the legislature. We are further definitely of the opinion that if this conclusion should be deemed improper, the mine foreman and assistant mine foreman made an honest effort to comply with the requirements of this rule, as they construed it, and that they could not be deemed negligently guilty of an offense against the provisions of the act, but rather of an honest error of judgment.

Therefore, now, December 4, 1945, the three defendants are adjudged not guilty.