## Voloshen, Appellant, *v.* Mann.

Argued March 19, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*J. Roland Johnston,* for appellant.

*Gilbert J. Helwig,* with him *Elder W. Marshall,* and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 21, 1958:

The opposing litigants in this case are sisters which perhaps offers one reason why the figure of Justice is portrayed blindfolded so that she may not have to look upon the melancholy spectacle of members of the same family fighting, condemning, and reviling one another. However, we are concerned here only with the legal problems involved in the controversy and pass no judgment on the interwoven sentimental unities.

From 1927 to 1947 Dorothy Voloshen and Ida Mann (they were both married) were almost inseparable. The relationship between them was even profounder than one of consanguineous kinship. Ida, the older of the sisters, and the defendant in this lawsuit, did not enjoy the best of health, whereupon her younger sister,

Dorothy, the plaintiff, volunteered to care for her as nurse, housekeeper, and companion. In doing so, Dorothy remained away from her home for long intervals, neglecting to that extent the duties she owed as wife and mother to her own family. In recognition of this sacrifice, Ida from time to time told her she would demonstrate her gratitude in a tangible manner by making Dorothy the sole beneficiary of her will, when she should write it.

In 1947 Dorothy felt compelled, because of complaints in her home over her extended absences therefrom, to cease attending upon Ida and so informed her. Ida's husband urged her to continue with the services she had been rendering for twenty years and, in compensation, promised her certain stock in the Pittsburgh Laundry Company and a trust fund which would net Dorothy a handsome annuity upon his death and an even more attractive one upon Ida's death. Dorothy, upon those representations, resumed attendance upon her sister and even accompanied her to Florida where Ida and her husband now maintained their residence, having left Allegheny County, their original domicile.

In February, 1953, Ida signed a typewritten letter in which she stated that upon her return to Pittsburgh she would execute a will, leaving her entire estate to Dorothy. However, in November, 1953, difficulties, which sometimes strain relations between the closest of friends and tragically between relatives as well, arose; and the bond of love and affection between the sisters broke. In this breakage, Ida repudiated her promise of a testamentary reward to her sister. Dorothy retaliated by instituting an action in assumpsit (in November, 1954), both against Ida and her husband, claiming $314,976, computed on the value of the laundry

stock and the annuity Benjamin Mann had promised to provide for her.

However, on October 7, 1955, the strained relations eased sufficiently for Dorothy to meet with the attorney for her sister (and her husband) and they drew up an agreement which, after a preamble directed to the pending litigation, stated that the parties desired "to amicably settle the said suit and to release one another from any and all claims either by reason of matters which are the subject matter of that suit or by reason of any other matter or thing whatsoever, all upon the terms and conditions more fully hereinafter set forth."

The pending lawsuit was accordingly discontinued, but on May 7, 1956, Dorothy filed a second complaint in assumpsit against her sister (the latter's husband having in the meantime died), this time claiming the fair value of the services she had rendered from 1927 to 1953. Ida filed an answer and the cause came on for trial in the Court of Common Pleas of Allegheny County. The jury returned a verdict in Dorothy's favor in the sum of $32,000. Ida moved for judgment n.o.v., which was granted by the Court en banc, and the plaintiff appealed.

Although some of the details of the narrative above recited were contradicted by the defendant, we have accepted them as established since, in considering judgment n.o.v., the verdict-winner, here the plaintiff, is entitled to have the testimony considered in the light most advantageous to her. But, even resolving all contradictions, doubts, and ambiguities in the testimony in Dorothy's favor, we still conclude that the Court below was justified in entering judgment n.o.v. The plaintiff Dorothy has admitted that she signed the agreement of October 17, 1955, and it is upon this rock that her whole case splits and founders.

When two opponents, who have been desperately fighting each other, lay down their weapons and enter into an agreement wherein each reaps an advantage which may be a disadvantage to the other, but whereby in the long run both are better off than if they had continued shooting or stabbing at each other, one may not, without the consent of the other, repudiate his or her commitment and once more take up the sword, gun, or slingshot. The plaintiff does not deny this accepted commonplace in the affairs of human dealings, but she asserts that the agreement of October 17, 1955, was not intended to settle *all* differences between herself and her sister. Dorothy specifically urges upon us the argument that there was no intendment that Ida should be released of the liability rising from the letter of February, 1953, since the letter was not mentioned in the agreement. It is true that we said in *Crum v. Pennsylvania R.R. Co.,* 226 Pa. 151, 156 : "It is a settled rule of construction that an agreement comprehends only those things in respect to which it appears the contracting parties proposed to contract, and not others they never thought of." But it can scarcely be maintained, consonant with the normal functioning of memory, that both Dorothy and Ida did not have in mind the letter of February, 1953, when they signed the Agreement of October, 1955. Dorothy's whole claim against her sister was predicated on Ida's promise to make a will in Dorothy's favor, and that claim took definitive form in the indicated letter.

It is a strange turn which the plaintiff's argument takes when she says that the letter of February, 1953, was not in the contemplation of the parties at the time the Agreement was signed because Ida had denied signing such a letter. But it was the plaintiff who was releasing the defendant, and so long as she knew of the existence of the letter and was relying on it, but never-

theless signed the broad release, she cannot now be heard to say that it was not binding because the defendant denied that there ever was such a letter. Dorothy cannot deny that she was vividly aware of the existence of the letter. The letter was the very crystallization into tangible evidence of her claim extending over 26 years. The letter was the very vessel in which the present litigation was launched.

The learned Court of Common Pleas very properly said in its able opinion that: "It is significant that both the claim in the prior action and the present claim are for services rendered to nurse and comfort defendant from 1927 to November 1953. The only difference in the two claims is the promise upon which plaintiff relied as to the source of compensation. In the prior suit, plaintiff alleged that the services were performed in reliance upon promises made by defendant and her husband and each of them that she would be compensated from the estate of defendant's husband, Mr. Mann. In the present suit, plaintiff alleges that the services were performed in reliance upon promises made by defendant that she would be compensated by defendant's will."

The fact that the letter of February, 1953, was not specifically mentioned in the agreement of October, 1955, is not controlling. In the case of *Flaccus v. Wood,* 260 Pa. 161, we said: "We do not overlook the rule that words used in a release should not be construed to extend beyond the express consideration mentioned or to operate as a release of indebtedness the parties apparently did not intend. . .; this, however, is a rule of construction and can have no application, where, as in the present case, the very language used by the parties excludes its use. We have here a written admission signed by plaintiff acknowledging decedent owed her nothing at that date."

The release in the case at bar shows by its very language that it was intended to be a general release of "any and all claims either by reason of matters which are the subject matter of that suit or by reason of any other matter or thing whatsoever." Each of the parties, speaking in the present tense, "releases, exonerates and forever discharges the other of and from any and all claims which any of the parties hereto has or may have against the other, including without limiting the generality of the foregoing," the claim upon which the suit had been brought. It is obvious from this wording that the mention or failure to mention specific claims may not detract from the broad sweep of the release. He who sows in general language will reap the harvest of his voluntary widespread planting. As stated in *Moore v. Stevens Coal Co.*, 315 Pa. 564: "In interpreting contracts, as in interpreting wills, the guide to intentions is the terms used unless they are ambiguous. The respective rights and obligations which the words of a contract clearly express are the rights and obligations which the courts must recognize and enforce. . .".

Paragraph 4 of the agreement declares in its entirety: "4. Upon receipt of the aforesaid stock and sum of money and upon the settlement and discontinuance of the aforesaid action and release of attachment, each of the parties hereto releases, exonerates and forever discharges the other of and from *any and all claims* which any of the parties hereto *has or may have* against the other, including *without limiting the generality of the foregoing* the claim which the party of the first part has or may have against the parties of the second part by reason of the matters and claims asserted in the said suit." (Emphasis supplied).

The agreement was based on a valuable consideration, for, in addition to the stock and money paid the

plaintiff as "full payment and satisfaction," it is to be noted that the release was a mutual one, thus absolving Dorothy of any indebtedness owing from her to Ida and her husband. Ida and her husband also agreed to forego for six months "principal payments on the mortgage" held by them through a David Roth. -Moreover, the agreement was under seal.

The plaintiff finally seeks to extricate herself from the obligations voluntarily undertaken in the agreement by asserting that the attorney who acted for Ida and her husband did so without adequate authority from them. The power of attorney signed by Ida and Benjamin Mann is conclusive evidence to the contrary. It states: "Our attorney shall have full power to enter into any settlement, agreement and/or to execute any and all papers and to do any and all things necessary and in any manner he so desires to effectively carry out the settlement of the said suit giving and granting unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, to all intents and purposes, as we might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that our said attorney or his substitute shall lawfully do or cause to be done by virtue hereof."

Judgment affirmed.