[J-77-2015] [MO: Todd]

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, BY KATHLEEN G. KANE, ATTORNEY GENERAL; PENNSYLVANIA DEPARTMENT OF INSURANCE, BY TERESA D. MILLER, INSURANCE COMMISSIONER; AND PENNSYLVANIA DEPARTMENT OF HEALTH, BY DR. KAREN MURPHY, SECRETARY OF HEALTH | No. 48 MAP 2015<br><br>Appeal from the Order of the Commonwealth Court at No. 334 MD 2014 dated May 29, 2015.<br><br>ARGUED: October 6, 2015 |
| v. | |
| UPMC, A NONPROFIT CORP.; UPE, A/K/A HIGHMARK HEALTH, A NONPROFIT CORP., AND HIGHMARK, INC., A NONPROFIT CORP. | |
| APPEAL OF: UPMC, A NONPROFIT CORP. | |

## CONCURRING AND DISSENTING OPINION

**MR. JUSTICE BAER**                    **DECIDED: November 30, 2015**

I commend the Majority Opinion for its excellent recitation in Part I of the acrimonious factual and contractual history of this complex legal dispute. Additionally, I join Part IV of the opinion rejecting UPMC's challenges to Paragraphs Three and Four of the Commonwealth Court's order below. Also, I agree with the Majority that the Commonwealth's overarching intent in drafting the Consent Decree, and specifically the Vulnerable Population Provision, was to protect the listed at-risk groups, including Medicare Advantage participants, from becoming collateral damage in the war between

Highmark and UPMC. Indeed, the path taken by the Majority in Part II is an understandable attempt to comport the intent to protect Medicare Advantage subscribers with the language of the Vulnerable Population Provision. Nevertheless, I am constrained to dissent from Part II because I conclude that the Majority's interpretation is inconsistent with the plain language of the provision.

While the Consent Decree unambiguously provides protection for most of the listed vulnerable populations, the parties either intentionally or negligently failed to require UPMC and Highmark to continue to contract regarding Medicare Advantage. This Court has no authority to read ambiguity into plain language in order to effectuate what we discern to be the more favorable result. As set forth below, I conclude that the language plainly does not require UPMC to continue to contract with Highmark in regard to Medicare Advantage, even if that was the original intent of the parties and would have been the better policy for the citizens of this Commonwealth. See, e.g., Willison v. Consolidation Coal Co., 637 A.2d 979, 982 (Pa. 1994) ("The accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement."); Moore v. Stevens Coal Co., 173 A. 661 (Pa. 1934) ("It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly.") (quoting 13 C.J. § 485, at 524).

As noted by the Majority, prior to signing the Consent Decree, UPMC and Highmark, in 2012, entered into a Mediated Agreement and a related global amendment of the prior individual Medicare Advantage provider agreements, which specified that the underlying Medicare Advantage provider agreements could not be terminated earlier than December 31, 2014, and would automatically renew annually after December 2014

unless either party provided timely notice of termination. Following disputes between the parties, the Commonwealth brokered the Consent Decree relevant to this case.[1] The Consent Decree specifies that it is not a contract extension of the prior provider agreements and instead creates separate contractual obligations between Highmark and UPMC in regard to the specified service areas, including emergency room/trauma services, oncology/cancer services, unique hospitals (such as Western Psychiatric Institute and Clinic), and, as relevant to the case at bar, vulnerable populations. UPMC Consent Decree, § I(A). The question presented in the case is whether the following four-sentence Vulnerable Population Provision of the Consent Decree acts to restrict UPMC's right under the Mediated Agreement to terminate its provider agreements for Medicare Advantage:

> [VP-1] UPMC and Highmark mutually agree that vulnerable populations include: (i) consumers age 65 or older who are eligible or covered by Medicare, Medicare Advantage, (ii) Medigap health plans, (iii) Medicaid and/or (iv) CHIP. [VP-2] With respect to Highmark's covered vulnerable populations, UPMC shall continue to contract with Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for CHIP, Highmark Signature 65, Medigap and commercial retiree carve out as long as Highmark does not make unilateral material changes to these programs. [VP-3] UPMC shall treat all Medicare participating consumers as In-Network regardless of whether they have Medicare as their primary or secondary insurance. [VP-4] UPMC reserves the right to withdraw from these arrangements if Highmark should take the position that it has the authority to revise the rates and fees payable under those arrangements unilaterally and materially.

---

[1]    We will use the singular term "Consent Decree" to reference the document signed by UPMC. However, we recognize that Highmark signed a functionally equivalent decree with the same language.

UPMC Consent Decree, § IV(A)(2) (sentence designations added for ease of discussion).

The first sentence, which will be referenced as VP-1, undisputedly provides that UPMC and Highmark agree "that vulnerable populations include: (i) consumers age 65 or older who are eligible or covered by Medicare, Medicare Advantage, (ii) Medigap health plans, (iii) Medicaid and/or (iv) CHIP." Id. This sentence distinguishes between Medicare and Medicare Advantage programs, a distinction that is consistent with federal law. As the Majority notes, Medicare Advantage is Part C of the Medicare program which is governed by separate statutes and regulations from those governing standard Medicare Parts A (hospital) and B (medical). Maj. Op. at 16-18. Medicare Advantage is administered by private insurance companies that negotiate with health care providers regarding rates for services, while Medicare Parts A and B are administered by the federal government with rates set by the Centers for Medicare and Medicaid Services (CMS), without negotiation with the provider. Maj. Op. at 18. An individual cannot have both standard Medicare and Medicare Advantage because they provide essentially the same benefits. Maj. Op. at 16-18. Thus, Medicare Advantage and Medicare are distinct programs, which the Consent Decree recognizes in VP-1.

The second sentence of the Vulnerable Population Provision ("VP-2") addresses when UPMC is bound to continue to contract with Highmark:

> With respect to Highmark's covered vulnerable populations, UPMC shall continue to contract with Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for CHIP, Highmark Signature 65, Medigap and commercial retiree carve out as long as Highmark does not make unilateral material changes to these programs.

UPMC Consent Decree, § IV(A)(2). This sentence clearly requires UPMC to "continue to contract with Highmark at in-network rates" for the groups listed in the sentence, which, conspicuously and importantly, does not include Medicare Advantage.

There is a reason for this omission, which informs our analysis. A prior draft of the sentence included Medicare Advantage in the list of vulnerable populations for which UPMC was obligated to continue to contract with Highmark. During the negotiations resulting in the final language, Highmark requested that Medicare Advantage be stricken from the "continue to contract" provision to permit Highmark to offer its new Community Blue Medicare Advantage product that did not include UPMC as an in-network provider. See Cmwlth. Ct. Op., June 29, 2015, at 19-20; UPMC Brief at 38-40. If Medicare Advantage had remained in this list, the entire four-sentence Vulnerable Population Provision would have fulfilled its purpose of protecting the vulnerable populations listed in the first sentence. However, while the parties included Medicare Advantage as a vulnerable population in VP-1, they failed to protect this population by binding UPMC to continue to contract with Highmark when they intentionally deleted the term from VP-2 during the drafting process. I fully agree with the Majority that this sentence does not require UPMC to continue to contract with Highmark regarding Medicare Advantage. Maj. Op. at 41.

While the Majority acknowledges the absence of Medicare Advantage from VP-2, it finds the third sentence ("VP-3") ambiguous in an attempt to protect Medicare Advantage participants. Maj. Op. at 36-37. Unfortunately, the plain language of VP-3 does not allow for such a reading, as again it provides:

> UPMC shall treat all Medicare participating consumers as In-Network regardless of whether they have Medicare as their primary or secondary insurance.

UPMC Consent Decree, § IV(A)(2). The Majority acknowledges that this sentence does not utilize "the same 'continue to contract' terminology" as VP-2, but concludes that the sentence "nevertheless obliges UPMC to treat those participants in Highmark Medicare Advantage programs as 'In-Network,' and, thus, requires [UPMC] to have a contract with Highmark that establishes negotiated rates for treatment of those in Medicare Advantage programs for which Highmark currently has provider contracts with UPMC [or through arbitration under Section IV(C)(1)(a)(iii)]." Maj. Op. at 47. While the Majority's paraphrase of the sentence unambiguously champions the protection of Medicare Advantage participants, the Consent Decree itself simply does not include this language.

We must restrict our examination to the language to which the parties actually agreed. There is just no way to construe the language of VP-3 to require UPMC to continue to contract with Highmark regarding Medicare Advantage. If the parties desired to require UPMC to continue to contract with Highmark regarding Medicare Advantage, they could have either included the term in VP-2, as suggested above and as they did in an earlier draft, or they could have drafted a separate sentence stating: "UPMC shall continue to contract with Highmark at in-network rates for all of its hospital, physician and appropriate continuity of care services for Medicare Advantage." This language or a similar expression does not exist in the Vulnerable Population Provision, and I am unable to twist the language of VP-3 into a "continue to contract" provision to reform the parties' removal of Medicare Advantage from VP-2, the substantive provision requiring UPMC to continue to contract with Highmark.

The plain language of VP-3 addresses the separate and very limited issue of the rate UPMC charges in a coordination of benefits situation where a patient has both a primary and a secondary source of health insurance coverage, where one source is

Medicare, which does not utilize negotiated rates, and the other source is a health plan with negotiated in-network rates. The sentence addresses a problem that apparently plagued the parties prior to the Consent Decree regarding the rate charged when a patient was covered by both Medicare and a private insurance plan. UPMC Brief at 47-49 (quoting testimony of Highmark President Deborah Rice-Johnson, Notes of Testimony ("N.T."), May 27, 2015, at 215). The clear language of VP-3, when read in conjunction with the defined term "In-Network," merely provides that "regardless of whether [the consumers] have Medicare as their primary or secondary insurance[,]" "UPMC shall treat" the consumers "as In-Network," which pertains to "where a health care provider has contracted with a Health Plan to provide specified services for reimbursement at a negotiated rate."[2] UPMC Consent Decree, §§ IV(A)(2), II(I). The

---

[2]     The Consent Decree defines "In-Network" as :

> "In-Network" means where a health care provider has contracted with a Health Plan to provide specified services for reimbursement at a negotiated rates to treat the Health Plan's members. The member shall be charged no more than the co-pay, co-insurance or deductible charged by his or her Health Plan, the member shall not be refused treatment for the specified service in the contract based on his or her Health Plan and the negotiated rate paid under the contract by the Health Plan and the member shall be payment in full for the specified services.

UPMC Consent Decree, § II(I).

        Additionally, the Consent Decree includes detailed provisions to set the In-Network rate in the absence of a negotiated rate, which could pertain to situations where UPMC and Highmark do not have a current contract. Section IV(C)(1)(a)(i) provides that if the parties cannot otherwise negotiate the rates, the "In-Network" rates for 2015 "shall revert to the last mutually agreed upon rates or fees by UPMC and Highmark with the applicable medical market basket index (MBI) increase applied January 1, 2015." Similarly, Section IV(C)(1)(a)(iii) addresses "In-Network" rates for the period beginning January 1, 2016 until the later of the expiration of the Consent Decree (continued…)

definition of "In-Network" further operates to protect the consumer by limiting the amount the member can be charged to "no more than the co-pay, co-insurance, or deductible charged by his or her Health Plan" and instructs that the member "shall not be refused treatment for the specified services in the contract based on his or her Health Plan." Id. Finally, it provides that the negotiated rate "shall be payment in full for the specified services."[3] Id. Thus, VP-3 limits the out-of-pocket expense of an individual who has both Medicare (which would pay no more than the CMS designated rate) and another health plan (which would pay up to the in-network rate).[4]

I see no suggestion in the language of VP-3 that the parties intended to require UPMC to continue to contract with any entity; rather it simply addresses the rate applicable for the treatment of a consumer who is covered by Medicare in addition to another health plan. Ambiguity only arises in this sentence when it is read to address

_____

(…continued)
or "the expiration of any agreements between UPMC and Highmark for all In-Network services" and provides that the rates shall either be negotiated between UPMC and Highmark or requries UPMC and Highmark to "engage in a single last best offer binding arbitration."

[3]     In summarizing its argument in regard to VP-3, Highmark states, "[t]he Consent Decree defines 'In-Network' to mean that UPMC 'has contracted with' Highmark." Highmark Brief at 28. The definition of In-Network does not state that UPMC has or has not contracted with Highmark, nor does it inform whether UPMC currently has a contract with Highmark; it merely describes what happens if a heath care provider, like UPMC, has contracted with a Health Plan, like Highmark. Moreover, as noted supra in note 2, the Consent Decree addresses the situation where there is no current negotiated in-network rate. Highmark's recitation of the contractual language, thus, appears to be a mischaracterization of the definition of In-Network.

[4]     Notably, as the Commonwealth Court correctly acknowledged during the hearing, VP-3 is not a standard coordination of benefits provision in that it is not determining which plan is primary and which is secondary; instead, it is dictating what rate will apply to services provided to this subset of patients regardless of which program is the patient's primary insurance. N.T., May 27, 2015, at 398-99.

an entirely unrelated concept of contract continuation in an effort to compensate for the Commonwealth's and UPMC's acquiescence to Highmark's request to remove Medicare Advantage from VP-2.[5]

I respectfully disagree with the criticism of this analysis as explained by my colleagues in the Majority and the Commonwealth Court. First, I reject the reading of VP-3's term "Medicare participating consumer" to include consumers with Medicare Advantage. Maj. Op. at 41-44; Cmwlth. Ct. Op., June 29, 2015, at 27-28. It is beyond cavil, and all parties agree, that Medicare Advantage is an integral part of the Medicare system as Part C, along with the federally operated Medicare Parts A and B. Thus, unmoored to the language of the current provision, it would be eminently reasonable to refer to someone who has Medicare Advantage as a "Medicare participating consumer." However, the negotiated language of VP-1 distinguishes between "Medicare" and "Medicare Advantage," such that the term "Medicare," for purposes of this provision, applies only to the federally operated Medicare Parts A and B, and is distinct from Medicare Advantage, the private-insurer-operated Medicare Part C. Under our rules of contract interpretation, we cannot recognize the drafters' distinction between the two terms in VP-1 and ignore it in VP-3. See Maloney v. Glosser, 235 A.2d 607, 609 (Pa. 1967) (observing that Williston on Contracts instructs that "a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons"); 11 Williston on Contracts § 32:6.

---

[5] Moreover, Highmark's suggestion that VP-2 addresses non-Medicare entities and VP-3 addresses Medicare entities fails. Highmark Brief at 34-35. As noted above, VP-3 does not contain any language requiring UPMC to contract with any entity, but merely defines the rates to be applied if a patient has two insurers. Additionally, there would be no reason to require UPMC to contract for in-network rates with Medicare because, as all have acknowledged, CMS sets non-negotiable rates for Medicare. Therefore, if VP-3 can only apply to Medicare Advantage, as Highmark argues, Highmark Brief at 32-33, the parties should have used that term rather than Medicare.

Secondly, our reading of Medicare participating consumer as applying solely to those consumers with Medicare Parts A and B is consistent with the provision's intent to protect at-risk groups and is not illegal as suggested by the Majority and the Commonwealth Court. Maj. Op. at 44; Cmwlth. Ct. Op., June 29, 2015, at 28. My colleagues accept Highmark's argument that reading the term "Medicare participating consumer" to mean only a consumer participating in Medicare Parts A and B would require the legal impossibility of UPMC negotiating rates with Medicare. This is a straw man argument created to obfuscate the analysis. As discussed above, VP-3 is not requiring UPMC to negotiate regarding rates but instead dictates the rate that a health care provider can charge for a customer's treatment and directs that the "in-network" rate of the health plan applies regardless of whether Medicare is the primary or secondary insurer. This plain reading does not suggest any need to negotiate payment rates with Medicare, which all agree are set by the CMS.

Finally, the Commonwealth Court opined that if the drafters intended to refer only to Medicare rather than a broader category of Medicare participating consumers, then "it easily could have stated 'Medicare' instead of Medicare participating consumer." Cmwlth. Ct. Op., June 29, 2015, at 27-28. Respectfully, the drafters could not have used only the term Medicare because the provision is addressing the consumers, not the plan. Specifically, the sentence is addressing consumers who have multiple insurance coverages, one of which is Medicare. Thus, "Medicare participating" is an adjective phrase describing the consumer. It would eliminate the purpose of the phrase to use the term "Medicare," which describes the plan, not the person. The phrase cannot be drafted in any more limited fashion than "Medicare participating consumers."

As previously discussed, I agree that the Commonwealth, at the outset of the negotiations, intended to protect Medicare Advantage participants as they were

specifically included in the vulnerable populations listed in VP-1 of the provision. Moreover, Medicare Advantage participants should have been included in the protections provided by the Consent Decree. Indeed, they were included in the protections of the "continue to contract" provision, until the term was deleted at Highmark's request during negotiations. It is not within this Court's authority to reinsert the protection for Medicare Advantage into the Vulnerable Population Provision when it was specifically removed by the parties. We also cannot read an otherwise clear sentence addressing a separate concept as ambiguous merely to correct a concession made during difficult negotiations. I find no ambiguity in VP-3, which simply addresses a problem that arises in a coordination of benefits situation.

While the result of this contractual analysis is to permit UPMC to terminate its Medicare Advantage agreements with Highmark, which in turn will result in UPMC doctors and hospitals being "out of network" for Highmark Medicare Advantage participants, it does not necessarily leave the Medicare Advantage participants without recourse. The Commonwealth Court observed that CMS could allow "a special enrollment period." Cmwlth. Ct. Op., June 29, 2015, at 24. In such a case, Highmark's Medicare Advantage participants could choose to stay with their Highmark plan or switch to another plan which would allow in-network access to UPMC doctors and facilities. Cmwlth. Ct. Op., June 29, 2015, at 23-24. Additionally, testimony was presented to the Commonwealth Court that CMS can grant individualized special enrollments to customers who assert that they are "confused." N.T., May 27, 2015, at 342, 365, see also Cmwlth. Ct. Op., June 29, 2015, at 22.

As a function of this Court's basic duty to decide the plain meaning of a contract, I dissent from Part II of the Majority Opinion and would reverse the Commonwealth Court's order to the extent it holds that UPMC must continue to contract with Highmark

regarding Medicare Advantage. As I would reverse on this basis, I need not address whether UPMC establishes its right to relief under Part III of the Majority Opinion addressing the fourth sentence of the Vulnerable Population provision. Finally, as noted at the outset of the opinion, I join Part IV of the Majority Opinion addressing Paragraphs Three and Four of the Commonwealth Court Order.

Mr. Justice Stevens joins this concurring and dissenting opinion.