## Gerhart v. Cathedral Village

*John Potts*, for plaintiff.
*Frank Luchak*, for defendant.

SMITH, Jr., *J.*, September 7, 1982—Defendant is a corporation conducting a life-care retirement community. Plaintiff is a 72 year old widow who became a resident of the facility operated by defendant on March 1, 1982. On May 26, 1982, defendant gave plaintiff written notice of termination of her residence, effective that day. This was in exercise of the purported privilege reserved to defendant under a certain clause of the formal printed agreement executed by the parties before plaintiff entered upon residence. Under this clause, defendant was at liberty to exclude her from the facility, return the considerable sum paid by her at execution of the contract, and abrogate the contract entirely at any time within three months after plaintiff's first taking up residence. By this complaint in equity plaintiff seeks to have defendant preliminarily and eventually permanently enjoined from so excluding her. A temporary restraining order (injunction granted without notice) obtained on complaint and affidavits came before the court for hearing under Pa.R.C.P. 1531(d), presenting the question whether the temporary injunction should be dissolved, continued, or modified.

The contract in question provided that defendant furnish plaintiff with living quarters for her exclu-

sive occupancy, certain furnishings, meal service in a common dining room, and general medical, surgical, hospital, and nursing care as needed, until her death. Defendant, however, was expressly relieved of the cost of medical or surgical care for any specifically expected reason disclosed by medical examination, and in plaintiff's case, there appears in the contract the stated exception "Depression." This exception is initialed by plaintiff. The reason for this exclusion is made plain by another provision of the contract, Par. 3M, stating that Cathedral Village is not designed for the treatment of mental illness of any form.

The contract further provides that plaintiff pay and she had paid, the sum of $43,500 at execution of the agreement, and a monthly service charge of $894, her payment of which was also current when defendant gave her notice to surrender possession of her living quarters and withdraw from the facility.

The clause of the contract under which defendant took this action is as follows (Par. 6B):

"WITHIN THREE MONTHS AFTER OCCUPANCY (Probationary Period)—At any time within the probationary period, Resident may terminate this Agreement provided that, he (1) delivers written personally signed notice of termination to Community, and (2) surrenders the living accommodation. Within said three months period, Community may terminate this Agreement by written notice to Resident."

Powerful motivations and persuasive considerations underline the respective positions of both parties. Plaintiff was left a widow in 1980, by the very sudden death of her husband from a massive

heart attack suffered while their house was on fire. The older of two sons of the marriage is a clergyman living in New Jersey, and some degree of estrangement obtains between him and plaintiff, a reflection of tensions between plaintiff and his wife's family. The younger son, age 25 and unmarried, is not law-abiding and is disclosed by testimony at hearing as being of stormy, troublesome disposition. Plaintiff freely confessed to defendant, on being first attracted to the idea of becoming one of its residents, that she felt lonely and depressed, understandably so from the foregoing account of her family situation, and her own physician professionally made that diagnosis. She came to look forward to living at defendant's facility, to life with fellow-residents, and to participation in their various activities as a measure of relief from both her loneliness and her depression. In fact, she has become a regular member of the choir, and is a regular volunteer aide and visitor at the medical infirmary of the facility.

Plaintiff made her initial deposit of $1,000 to accompany her application for residency in August, 1981, was told her application had been approved, and from then until early 1982, waited to be reached on the waiting list of applicants. In the first few days of January, 1982 word came from defendant that she was third on that list and should be taking steps to put her home on the real estate market. This she did, and further disposed of all her household good and furnishings other than those she planned to take with her to Cathedral Village. She executed the life-care contract tendered her by defendant under date of January 26, 1982, and simultaneously paid defendant the balance, above her original $1,000 deposit, of the $43,500 consid-

eration fixed in defendant's scale for the living unit assigned her and the services or other accommodations to be provided.

Defendant's notice to plaintiff of abrogation of their agreement, nevertheless, can scarcely be characterized as sheerly arbitrary. Mrs. Pritchard, Enrollment Coordinator of defendant, testified that on May 19th plaintiff told her she had been advised by her own lawyer to take the precaution for her own protection of reporting to defendant some conduct of her younger son, David.The first series of events she reported was that she learned David had let himself into her empty house with his own key and the real estate man had found the thermostat set at 90 degrees and the oven turned on with no one at home. This prompted her to have the locks changed on the house, but while the locksmith was engaged in this work, David appeared on the scene, armed with a machete and threatened the locksmith. The locksmith told the realtor, the realtor called the police, and the police took David away. David has a criminal record, a conviction of arson and is serving a sentence of probation.

The second incident reported by plaintiff to Mrs. Pritchard was that within a few days previous David had visited her alone in her apartment, and there upbraided her bitterly for putting the house on the sales market, accusing her of "taking the roof from over his head." As the climax of this tirade he seized her by the shoulders and shook her to the point of her head banging against the wall.

Mrs. Pritchard testified that plaintiff's lawyer in conversation with her has described David as having a drug problem and expressed the opinion that David could be dangerous. Further testimony puts David presently in North Carolina, living with an aunt and uncle, and seeking employment there.

Alarm over such threats to plaintiff's safety and to the peace and order of its facility caused defendant, for several days, at additional expense in the form of overtime pay, to assign certain of its guard personnel to evening hour surveillance of the environs of plaintiff's living quarters. Thinking it advisable also to have plaintiff lodging elsewhere for a few days, defendant approached both the clergyman son of plaintiff and one of her friends to attempt such arrangements, only to have each decline on the same grounds, fear of reprisal from David. The outcome was that at defendant's request plaintiff made a brief sojourn at Quakertown Community Hospital. There, plaintiff testified a neuropsychiatrist, one Dr. Bloom, told her she had the alternative of undergoing psychiatric treatment or leaving Cathedral Village. Defendant disowns any such opinion on Dr. Bloom's part, or employing the doctor to give it. From its own staff physician, Dr. Phelan, however, defendant on May 6th appears to have had a report of plaintiff's being quite distresed over having her dog put to sleep, with advice that she should be closely followed, and the opinion expressed that she was a potential suicide candidate.

During plaintiff's absence at Quakertown Hospital, David made one appearance at Cathedral Village, but on being told his mother was elsewhere, left peaceably under escort of defendant's guard personnel. Defendant has tendered plaintiff a list of ten other comparable retirement facilities in suburban Philadelphia where she might expect her application for residence to be accepted. Defendant states the feature common to all, on the basis of which the list was composed, is that the topography of each makes external security against wrongdoers much easier and more certain of ac-

complishment than the physical layout of Cathedral Village. Nothing is stated of record as to how long plaintiff might have to wait for admission to another facility.

This is the first time defendant has had to invoke its purported privilege to abrogate its contract with a resident and exclude him from residence during the three month probationary period provided by Par. 6B of the agreement. Authorities briefed by counsel for the parties or developed by the court's own research contain no instance of exercise of such a reserved power by a retirement facility, and the questions presented by the controversy have to be answered by reference to principles established in cases involving other factual situations.

The contention of plaintiff's counsel at the hearing held pursuant to Pa.R.C.P. 1531(d) was that, despite the absoluteness of the language of Par. 6B of the contract, defendant was restricted to a reasonable and good faith exercise of that privilege. Defendant's conduct violated that restriction, it was urged. Counsel for defendant repudiates the motion that Par. 6B's absolute language is thus to be attenuated, and stands flatly for the entire arbitrariness of exercise of the privilege, if necessary, but in the alternative submits that even under the meaning plaintiff would read into this section, defendant cannot fairly and justly be held to have acted either reasonably or in bad faith.

The paragraph in question, on the most cursory reading, is seen to be two edged: The resident has precisely as absolute a right to abrogate the agreement within the three month probationary period as the facility. It strikes one as quite unlikely that anyone would suppose the resident's right to regret his decision, find life in the facility not up to his expectations or taste, and exercise his privilege to

opt out of his agreement should be hedged about by standards of reasonableness and good faith. Conversely, from the facility's standpoint, it is quite possible that a particular person's habits, manners, attitudes and indulgences might be truly discoverable only by daily observation of him as a resident. In the nature of the relationship contemplated by the contract, it is far more reasonable to accord the words the meaning they unqualifiably import, that on both sides the option to terminate is absolute. Even, however, were it otherwise, and a standard of reasonableness of good faith be held to control exerise of the privilege, the facts leading defendant to its decision to abrogate the agreement with plaintiff, make it impossible for this court to conclude that defendant acted other than reasonably and in good faith. It is possible to entertain the view that defendant overreacted to the negative factors in plaintiff's personal equation and did not make sufficient allowance for the positive factors. But more convincing is the view that defendant was justly apprehensive of the risks involved in permitting plaintiff to continue as a resident. Plaintiff is only one of many residents of its duties toward whom defendant is required to be mindful.

Authority is abundant that parties to a contract are bound to the plain meaning of its words as manifestly expressed rather than as silently intended: Steuart v. McChesney, 454 Pa. 1048, 444 A. 2d 659 (1982). Any other rationale would be a substitution of some subjective intent of one or the other party for their objective expression of intent. The principle has been applied to abrogation of a retirement facility contract by a resident: Baltimore Humane Impartial Soc., Inc. v. Morley, 156 Md. 478, 144 A. 521 (1929). Within a six month probationary period provided by that agreement,

the resident elected to withdraw and sue for refund, against the contention of defendant that he must assert good reason for his dissatisfaction. The court ruled that an option to terminate expressed in unqualified terms is not to be qualified by requiring a reason for its exercise.

Bearing tangentially on this aspect of the dispute is the fact that the contract tendered plaintiff by defendant was carefully reviewed by her attorney before its execution, that she signed it in its presence, that he is a widely experienced and thoroughly capable practitioner, and that for use by another retirement facility with its residents he had drafted a similar contract with essentially the same reciprocal privilege for termination within a probationary period. This provision or its equivalent is a common feature of a considerable number of agreements used by various retirement facilities, a collection of which appears at 128 U. of P. Law Review 849 p. 883-892.

Graver difficulties, however, attend the resolution of this controversey than a mere question of the meaning of particular language. Neither party at hearing or argument on continuance of the temporary restraining order addressed itself to questions that to the court seem fundamental to its power to intervene at all in the controversy. The court phrased them to the parties thus:

(1) to what extent, if any, is the contract in suit one for personal care and services?

(2) to what extent, if any, will equity grant specific performance of a contract for personal care and service? At the court's special request, the parties have briefed these questions with some thoroughness.

It is scarcely to be doubted that plaintiff is indeed seeking specific performance of the contract. Her

complaint prays for (1) a temporary restraining order against defendant's removal of her and her possessions, (2) an injunction against defendant's effecting such removal, (3) an order directing defendant not to interfere with plaintiff's rights to the living unit she is occupying.

Plaintiff's basic contention on this point of the matter is that the contract is not one for personal service because defendant is a corporation acting through agents or employees, and not a natural person. A personal service contract, by plaintiff's analysis, is personal only if the one rendering this service is a natural person. The suggestion implicit in this argument is that the individual identity and personality possessed by every natural person is an element of the relationship on which the other party places great reliance for his contracting this service in the first place.

The court is persuaded otherwise, and is of the opinion that even though the provider of this service may be other than a natural person, i.e., a corporation or other form of institutional enterprise, the contract may still be one for personal care and service. No authority is offered or discoverable to the court's independent research, for the distinction urged by plaintiff between a natural and a legally fictitious person or other entity as the provider of this service. Conversely, the criteria employed by recognized authority on the question what constitutes personal service would qualify any provider, individual natural person or not.

The Restatement (Second) of Contracts, §367(1) declares: "A promise to render personal service will not be specifically enforced."

There follows this comment:

"b. *What is personal service* . . . in determining what is a personal service, the policies reflected in

the more general rules on the effect of public policy (Sect. 365) and of the difficulty of enforcement (Sect. 366) are relevant. The importance of trust and confidence in the relation between the parties, the difficulty of judging the quality of the performance rendered, and the length of time required are significant factors . . . "

Section 365 of the Restatement, in turn, reads:

"Specific performance or an injunction will not be granted if the act of forbearance that would be compelled or the use of compulsion is contrary to public policy.

Comment b

*Compulsion against public policy.* Even though the act or forbearance that would be compelled is not against public policy, the use of compulsion to require that act or forbearance may be contrary to public policy. One example of this general principle is the rule under which a court will refuse to grant specific performance if the character of performance is such that enforcement will impose a disproportionate burden on the court (§366)."

Section 366 throws this light on the subject:

"A promise will not be specifically enforced if the character and magnitude of the performance would impose on the court burdens in enforcement and supervision that are disproportionate to the advantages to be gained from enforcement and the harm to be suffered from its denial.

Comment.

a. *Burden on the court as a factor.* Granting specific enforcement may impose on the court heavy burdens of enforcement or supervision. Difficult questions may be raised as to the quality of the performance under the decree. Supervision

may be required for an extended period of time. Specific relief will not be granted if these burdens are disproportionate to the advantages to be gained and the harm to be suffered from its denial . . . "

Application of these guidelines to the contract here in suit requires the conclusion that it is indeed one for personal care and service. The great weight of authority, accordingly, stands in the way of a grant of specific enforcement of the contract. An encyclopedic summary of this authority is set forth at 81 Corpus Juris Secundum *Specific Performance*, Section 96:

" . . . the equitable remedy may not be invoked to compel the performance of service of a strictly personal nature, requiring special knowledge, ability, experience, or the exercise of judgment, skill, taste, discretion, labor, tact, cooperation, energy, or integrity, and this is the case particularly where the performance of the contracted for service would be continuous over a long period of time."

"The foregoing rule is based on the fact that the mischief likely to result from an enforced continuance of the relationship incident to the service after it has become personally obnoxious to one of the parties is so great that the interests of society require that the remedy be denied, on the fact that the enforcement of a decree requiring the performance of such a contract would impose too great a burden on the courts, and some cases give as a reason for the rule the lack of mutuality of remedies."

Another cogent statement of the rule is that of Lindsay v. Glass, 119 Ind. 301, 21 N.E. 897, 898 (1889).

"Such contracts, involving continuing care and personal service, and requiring for their proper

execution that the parties concerned should occupy towards each other relations of confidence and esteem, cannot be specifically enforced while they remain executory: Ikerd v. Beavers, 106 Ind. 483, 7 N.E. REP. 326. . . . such contracts belong to a class the specific enforcement of which courts of chancery do not undertake. Parties who enter into such agreements must rely upon continuance of the confidence and esteem which induced the arrangement in the beginning, or take their chances to recover damages if the contract be repudiated . . . "

Martin v. Martin (Tex. Civ. App., 1950), 230 S.W. 2d 547, contains this statement:

" . . . it can readily be seen that a court of equity would not compel the (provider) to perform service and care for the (recipient) during the remainder of (recipient's) life if (provider) had refused to do so. Furthermore, no court of equity would require the (recipient) to live with (provider) if their relations had ceased to be cordial and if life with the (provider) had become intolerable. A court of equity simply does not have the means to enforce such a judgment. Such a court could not require the (provider) to be kind and thoughtful and considerate of (recipient), and in the absence of such things the contract should no be enforced . . . " (bracketed identifications supplied.)

The self-defeating character of a decree of specific enforcement is pointed out by Lambert v. Lambert, 96 N.H. 376, 77 A. 2d 34 (1950):

" . . . When disagreement and unfriendly relations supplant understanding and natural affection, courts have recognized the difficulty and in some cases the futility of compelling a continuance of the agreement for life support. The likelihood of

the aged (recipient) will receive the personal support and maintenance she bargained for is so small that equity does not undertake the dubious effort of enforcing it. . . . " (bracketing supplied).

The contract here in suit may very well be held to fall clearly within the interdict of specific performance set forth in these authorities. Any doubt of the personal nature of what defendant by this contract undertook to provide, it can be strenuously argued, undertaking is not simply to furnish lodging and board, as might any innkeeper, which might be impersonal enough as supplied to several hundred residents, but also to furnish medical, surgical, hospital and nursing care for life.

The gravest conceivable doubt, therefore, attends the question whether specific enforcement of this contract can be granted. The extreme hardship to be visited upon plaintiff by its denial, however, raises the question whether the temporary injunction now in force should not be allowed to so remain and termination of the rights of the parties be left to full, rather than preliminary hearing. The essential requirements for grant of a preliminary injunction have been frequently stated by our Supreme Court as (1) that it is necessary to prevent immediate and irreparable harm incapable of being compensated in damages, (2) that greater injury will result by refusing it than by granting it, and (3) that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct: Valley Forge Historical Society v. Washington Memorial Chapel, 493 Pa. 491 426 A. 2d 1123 (1981). These requirements appear abundantly satisfied in the present case.

A fourth requirement, often described as even more essential, is that the right of plaintiff be "clear" or "entirely clear." But in the latest pro-

nouncement of either of our appellate courts on the point, Courier Times v. United Feature Syndicate, _____ Pa. Super. _____, 445 A. 2d 1288 (1982), doubt beclouds the validity of the "entirely clear" or only merely "clear" requirement, leaving in shadow also the question whether it applies to all preliminary injunctions or to only those decreeing mandatory relief, and further proposing an alternative formulation of criteria, i.e., (1) the degree of irreparable harm that may befall either side if equitable relief is granted or withheld, (2) the probability of success for plaintiff after a full hearing.

With this somewhat less than certain guidance afforded by our appellate court decisions, and bearing all these considerations in mind, the Chancellor had concluded that the temporary restraining order presently in force should be continued until full and final hearing.