444 A.2d 659

**Lepha I. STEUART, Appellant,**

**v.**

**William McCHESNEY and Joyce McChesney, Appellees.**

Supreme Court of Pennsylvania.

Argued March 2, 1982.

Decided April 30, 1982.

M. Richard Mellon, Gerald J. Villella, Erie, for appellant.

James C. Blackman, Blackman, Blackman & O'Sheill, Warren, for appellees.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from an Order of the Superior Court[1] which reversed a Decree of the Court of Common Pleas of the Thirty-Seventh Judicial District construing a Right of First Refusal affecting the sale of certain real property.

On June 8, 1968, the appellant, Lepha I. Steuart, and her husband, James A. Steuart (now deceased), executed an agreement granting to the appellees, William C. McChesney and Joyce C. McChesney, husband and wife, a Right of First Refusal on a parcel of improved farmland. The agreement provided:

(a) During the lifetime of said Steuarts, should said Steuarts obtain a Bona Fide Purchaser for Value, the said McChesneys may exercise their right to purchase said premises at a value equivalent to the market value of the premises according to the assessment rolls as maintained by the County of Warren and Commonwealth of Pennsylvania for the levying and assessing of real estate taxes; provided, however, that the date of valuation shall be that upon which the said Steuarts notify said McChesneys, in writing, of the existence of a Bona Fide Purchaser.

On July 6, 1977, the subject property was appraised by a real estate broker at a market value of $50,000. Subse-

1. *Steuart v. McChesney*, 284 Pa.Super. 29, 424 A.2d 1375 (1981).

quently, on October 10, 1977 and October 13, 1977 respectively, appellant received bona fide offers of $35,000 and $30,000 for the land. Upon receiving notice of these offers, the appellees sought to exercise their right to purchase the property by tendering $7,820. This amount was exactly twice the assessed value of the property as listed on the tax rolls maintained in Warren County, it being the practice in that County to value real estate for tax assessment purposes at 50% of market value. The tender was refused, however, by appellant, who then commenced an action in equity seeking to cancel the Right of First Refusal, or, in the alternative, to have the agreement construed as requiring that the exercise price be that of a bona fide third party offer or fair market value as determined independently of assessed value. Appellees, requesting a conveyance of the subject premises for $7,820, sought specific performance.

The primary issue on appeal concerns the price at which the Right of First Refusal may be exercised. The Court of Common Pleas, after hearing testimony, held that the formula of twice the assessed value was intended to serve as "a mutual protective minimum price for the premises rather than to be the controlling price without regard to a market third party offer." The agreement was, therefore, construed as granting appellees a preemptive right to purchase the land for $35,000, the amount of the first bona fide offer received.[2] The Superior Court reversed, holding that the plain language of the agreement required that assessed market value, alone, determine the exercise price. We agree.

▇▇▇▇ It is well established that the intent of the parties to a written contract is to be regarded as being embodied in

2. Appellant relies, in part, on *Bobali Corp. v. Tamapa Co.*, 235 Pa.Super. 1, 340 A.2d 485 (1975) for the proposition that appellees' preemptive right must be exercised at a value equal to a bona fide offer received. As was held by the Superior Court in the instant case, however, the decision in *Bobali* is attributable solely to the express language of the agreement therein at issue and is not pertinent to the present case. *Steuart v. McChesney*, 284 Pa.Super. at 32–33, 424 A.2d at 1377–1378.

the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement. *Estate of Breyer*, 475 Pa. 108, 379 A.2d 1305 (1977); *Felte v. White*, 451 Pa. 137, 302 A.2d 347 (1973); *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865 (1965); *Siciliano v. Misler*, 399 Pa. 406, 160 A.2d 422 (1960); *Kennedy v. Erkman*, 389 Pa. 651, 133 A.2d 550 (1957); *Atlantic Refining Co. v. Wyoming National Bank of Wilkes-Barre*, 356 Pa. 226, 51 A.2d 719 (1947). As this Court stated in *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. at 230–231, 205 A.2d at 866, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.

Application of the plain meaning rule of interpretation has, however, been subjected to criticism as being unsound in theory. "The fallacy consists in assuming that there is or ever can be *some one real* or absolute meaning." 9 Wigmore, *Evidence* § 2462 (Chadbourn rev. 1981). "[S]ome of the surrounding circumstances always must be known before the meaning of the words can be plain and clear; and proof of the circumstances may make a meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear." 3 Corbin, *Contracts* § 542 (1960). "It is indeed desirable that it be made as difficult as is reasonably feasible for an unscrupulous person to establish a meaning that was foreign to what was in fact understood by the parties to the contract. However, this result can be achieved without the aid of an inflexible rule." Murray, *Contracts*, § 110 (1974).

While adhering to the plain meaning rule of construction, this Court, too, has cautioned:

We are not unmindful of the dangers of focusing only upon the words of the writing in interpreting an agreement. A court must be careful not to "retire into that lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair inspect the text, and answer all questions without raising his eyes." Thayer, Preliminary Treatise on Evidence 428, quoted in 3 Corbin on Contracts § 535 n.16 (1960).

*Estate of Breyer*, 475 Pa. at 115 n.5, 379 A.2d at 1309 n.5 (1977). Indeed, whether the language of an agreement is clear and unambiguous may not be apparent without cognizance of the context in which the agreement arose:

The flexibility of or multiplicity in the meaning of words is the principal source of difficulty in the interpretation of language. Words are the conduits by which thoughts are communicated, yet scarcely any of them have such a fixed and single meaning that they are incapable of denoting more than one thought. In addition to the multiplicity in meaning of words set forth in the dictionaries there are the meanings imparted to them by trade customs, local uses, dialects, telegraphic codes, etc. One meaning crowds a word full of significance, while another almost empties the utterance of any import.

*Hurst v. Lake & Co., Inc.*, 141 Or. 306, 310, 16 P.2d 627, 629 (1932), quoted in 4 Williston, *Contracts* § 609 (3d. ed. 1961).

Nevertheless, the rationale for interpreting contractual terms in accord with the plain meaning of the language expressed is multifarious, resting in part upon what is viewed as the appropriate role of the courts in the interpretive process: "[T]his Court long ago emphasized that '[t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with ... the accepted and plain meaning of the language used.' *Hagarty v. William Akers, Jr. Co.*, 342 Pa. 236, 20 A.2d 317 (1941)." *Felte v. White*, 451

Pa. at 144, 302 A.2d at 351. " 'It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly.' [13 C.J. § 485, p. 524]" *Moore v. Stevens Coal Co.*, 315 Pa. 564, 568, 173 A. 661, 662 (1934). In 17A C.J.S. *Contracts* § 296(3), appears the following:

> The court may not rewrite the contract for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice ... make for [the parties] a better contract than they chose, or saw fit, to make for themselves, or remake a contract, under the guise of construction, because it later appears that a different agreement should have been consummated in the first instance. . . .

(Footnotes omitted.)

In addition to justifications focusing upon the appropriate role of the courts in the interpretive process, the plain meaning approach to construction has been supported as generally best serving the ascertainment of the contracting parties' mutual intent. "When the parties have reduced their agreement to writing, the writing is to be taken to be the final expression of their intention." 17A C.J.S. *Contracts* § 296(2). "Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention." 17A C.J.S. *Contracts* § 296(2). "In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly." *Moore v. Stevens Coal Co.*, 315 Pa. at 568, 173 A. at 662. Neither can it be assumed that the parties were ignorant of the meaning of the language employed. *See Fogel Refrigerator Co. v. Oteri*, 391 Pa. 188, 137 A.2d 225, 231 (1958).

Accordingly, the plain meaning approach enhances the extent to which contracts may be relied upon by contributing to the security of belief that the final expression of

*consensus ad idem* will not later be construed to import a meaning other than that clearly expressed. *Cf.* McCormick, *The Parol Evidence Rule as a Procedural Device for Control of the Jury,* 41 Yale L.J. 365, 365–366 (1932). Likewise, resort to the plain meaning of language hinders parties dissatisfied with their agreement from creating a myth as to the true meaning of the agreement through subsequently exposed extrinsic evidence. Absent the plain meaning rule, nary an agreement could be conceived, which, in the event of a party's later disappointment with his stated bargain, would not be at risk to having its true meaning obfuscated under the guise of examining extrinsic evidence of intent. Even if the dissatisfied party in good faith believed that the agreement, as manifest, did not express the *consensus ad idem,* his post hoc judgment would be inclined to be colored by belief as to what should have been, rather than what strictly was, intended. Hence, the plain meaning approach to interpretation rests upon policies soundly based, and the judiciousness of that approach warrants reaffirmation.

 In the instant case, the language of the Right of First Refusal, viewed in context, is express and clear and is, therefore, not in need of interpretation by reference to extrinsic evidence. The plain meaning of the agreement in question is that if, during the lifetime of the appellant, a bona fide purchaser for value should be obtained, the appellees may purchase the property "at a value equivalent to the market value of the premises according to the assessment rolls as maintained by the County of Warren and Commonwealth of Pennsylvania for the levying and assessing of real estate taxes." Indeed, a more clear and unambiguous expression of the Right of First Refusal's exercise price would be onerous to conceive. By conditioning exercise of the Right of First Refusal upon occurrence of the triggering event of there being obtained a bona fide offer, protection was afforded against a sham offer, made not in good faith, precipitating exercise of the preemptive right. The clear language of the agreement, however, in no manner links determination of the exercise price to the magnitude of the bona fide offer received through that triggering mechanism.

Were the present agreement to be regarded as ambiguous, so as to enable a court to consider extrinsic evidence of the meaning intended, as was done in the Court of Common Pleas, the policy of resorting to extrinsic evidence only when confronted with unclear or ambiguous language would be enervated. Certainly, the words of the Right of First Refusal are not indefinite, doubtful, or uncertain in their signification, so as to be regarded as unclear. Nor is the language reasonably or fairly susceptible to being understood in more than one sense so as to be regarded as ambiguous. "A patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." *Black's Law Dictionary* 105 (rev. 4th ed. 1968). In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 137 A.2d 332 (1957). "The usual instance of a latent ambiguity is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally." *Id.*, 391 Pa. at 35, 137 A.2d at 336. In holding that an ambiguity is present in an agreement, a court must not rely upon a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language cannot be distorted to establish the ambiguity. *Anstead v. Cook*, 291 Pa. 335, 337, 140 A. 139, 140, (1927). The instant agreement, not being reasonably susceptible to being understood in more than one sense, whether by patent or latent ambiguity, does not present language in need of extrinsic clarification.

By construing the clause in question to merely signify that the exercise price be, *in effect, "not less than"* the market value of the premises according to the assessment rolls, the Court of Common Pleas ignored the clearly expressed intent that the exercise price be *"equivalent* to the market value of

the premises according to the assessment rolls." To no extent is the term "equivalent", meaning "equal",[3] interchangeable with "not less than", and, since the parties specified the former, they shall be deemed to have intended the same. Hence, any divergence between the exercise price and the bona fide offer cannot be eliminated by construction where no ambiguity exists. Nor is there freedom, under the guise of construction, to redraft the Right of First Refusal simply because of the realization, at the time when rights under the agreement are to be exercised, that the market price according to the assessment rolls falls substantially short of the bona fide offers received.

■ Appellant contends that, based upon equitable considerations, specific performance at the assessed market value of $7,820 should be denied; in particular, the divergence between assessed market value and the amount of the bona fide offers assertedly renders an award of specific performance inequitable. As this Court has established, however, " '[i]nadequacy of consideration is not ground for refusing to decree specific performance of a contract to convey real estate, unless there is evidence of fraud or unfairness in the transaction sufficient to make it inequitable to compel performance . . .' *Welsh v. Ford*, 282 Pa. 96, 99, 127 A. 431, 432 (1925). *See also Payne v. Clark*, 409 Pa. 557, 560, 187 A.2d 769, 771 (1963); *Oreovec[z] v. Me[rics]*, 382 Pa. 56, 59, 114 A.2d 126, 128 (1955) . . ." *Snow v. Corsica Construction Co., Inc.*, 459 Pa. 528, 531–532, 329 A.2d 887, 888–889 (1974). Appellant alleges that an attorney employed solely by the appellees drafted the Right of First Refusal agreement, and that she was unfairly induced to enter the agreement without representation of her interests. This position ignores, however, an express finding of fact by the Court of Common

---

**3.** "Equivalent *carries with it the idea of value in some way* (Latin *aequus*, equal, plus *valere*, to be strong or valuable). When something adds up to something else in value or worth or significance or importance, the two are said to be equivalent the one to the other; when two or more things are exactly the same they are properly said to be equal. *Equal* is the simpler term, and applies to simpler considerations." J.B. Opdycke, *Mark My Words*, at 568–569 (1940).

Pleas, amply supported by testimony of record, that at the time of the preliminary negotiation and drafting of the agreement the parties were all represented by the same attorney. Hence, appellant's assertion is without merit.

Order affirmed.

ROBERTS, J., files a dissenting opinion in which LARSEN, J., joins.

ROBERTS, Justice, dissenting.

I dissent. Although the contract at issue mandates that appellees may purchase appellant's property at "the market value of the premises according to the assessment rolls as maintained by the County of Warren . . .," it is by no means clear that $7,820 is the price which appellees should pay.

The omission from the contract of a specific future purchase price was intentional because, according to the draftsman, the parties "wanted to reflect either increase or decrease of the assessed value as of [the] time" of appellees' exercise of the option to buy. To assure the accuracy and currency of this "reflection" of the change in assessed value, the parties provided that "the date of valuation shall be that upon which the said Steuarts notify said McChesneys, in writing, of the existence of a Bona Fide purchaser."

Written notice of appellant's receipt of an offer for the property was delivered to appellees on or about October 25, 1977. At that time, the assessed value of the property, as recorded on the tax rolls of Warren County, was $3,910, or 50% of the "market value" of $7,820. However, from the testimony of the draftsman, it would appear that the property had not been reassessed since 1972, when the assessed value was increased by only $405.

Section 602 of the Fourth to Eighth Class County Assessment Law provides:

"It shall be the duty of the chief assessor to assess, rate and value all subjects and objects of local taxation . . . according to the actual value thereof . . . . [R]eal proper-

ty shall be assessed at a value based upon an established predetermined ratio . . . not exceeding seventy-five per centum (75%) of its actual value or the price for which the same would separately bona fide sell. . . . "

72 P.S. § 5453.602(a) (1964). As this Court stated in *Brooks Building Tax Assessment Case*, 391 Pa. 94, 97, 137 A.2d 273, 274 (1958),

"[t]he term 'actual value' means 'market value' [citing cases]. And market value has been defined as the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied."

Accord, *Buhl Foundation v. Board of Property Assessment*, 407 Pa. 567, 570, 180 A.2d 900, 902 (1962).

Here, where appellant received bona fide offers of $30,000, $35,000, and $50,000 for her property, there can be no doubt that the actual value of appellant's property in 1977 was at least four times greater than the value according to the outdated assessment on the Warren County tax rolls. It is the height of unfairness to grant appellees' requested decree for specific performance at a price based on a valuation which took place in 1972. In effect, appellees are receiving a substantial windfall simply because Warren County has apparently failed to maintain accurate assessments "according to the actual value" of appellant's property, as required by law.

In these circumstances, I would remand this case to the Court of Common Pleas of Warren County for a determination of what the proper assessed value of appellant's property would have been on October 25, 1977, the "date of valuation," with directions to enter a decree of specific performance in favor of appellees at a "market value" based upon that determination.

LARSEN, J., joins in this dissenting opinion.