657 A.2d 27

**F. Robert DIETER, Appellant,**

**v.**

**FIDELCOR, INC., Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 7, 1995.

Filed April 12, 1995.

Harry A. Short, Jr., Philadelphia, for appellant.

Alfred W. Putnam, Jr., Philadelphia, for appellee.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

OLSZEWSKI, Judge:

In the mid–1980's, Joseph Gallagher and appellant F. Robert Dieter, as Chairman and President/Chief Operating Officer of Industrial Valley Bank (IVB), respectively, conducted merger negotiations with appellee Fidelcor. As a part of these negotiations, Gallagher and Dieter made provisions for their own employment at the post-merger Fidelcor. In March of 1986, the merger was completed and IVB was taken over by Fidelcor. On March 31, 1986, Gallagher and Dieter signed

new employment agreements with Fidelcor and began working for the new company.

On December 31, 1988, Dieter retired from Fidelcor; pursuant to section 6 of his employment agreement (Agreement), he began to receive retirement benefits totalling $135,000 annually. On April 18, 1991, after receiving retirement benefits for over two years, Dieter filed suit against Fidelcor seeking a benefit increase. Dieter claimed that Fidelcor was not correctly computing his retirement benefits because it was undervaluing his averaged "Annual Compensation" under the terms of the Agreement. More specifically, Dieter asserted that certain income derived from the exercise of company stock options should be included in the computation of his "Annual Compensation."

After completing discovery, both parties moved for summary judgment. The Honorable Clement J. McGovern, Jr., agreed with Fidelcor that the income from the exercise of stock options was not contemplated by the term "Annual Compensation" and granted summary judgment in Fidelcor's favor. This appeal followed.

The contract clause at issue here reads:

6. Beginning upon such date ... upon Executive's retirement ... and continuing for the duration of Executive's life, company agrees to pay Executive each month a retirement allowance ... equal to one-twelfth ($\frac{1}{12}$) of the higher of (i) fifty percent (50%) of Executive's average Annual Compensation (including salary, bonuses and incentive compensation ...) received by Executive during the five (5) consecutive years of his active employment with the company ... in which he received the highest Annual Compensation ... or (ii) ... $135,000 ... less the monthly amount, if any, payable under the company's retirement plan....

R.R. at 21a. Under Dieter's reading of this clause, income derived from the exercise of stock options comes within the term "Annual Compensation." If this income is included, his

average Annual Compensation in his five highest years [1] equals $357,196, fifty percent of which is $178,598. Since this is higher than the minimum amount of $135,000, Dieter asserts that he should be paid $178,598 annually pursuant to section 6(i). In contrast, Fidelcor does not include the income from the exercise of stock options in its computation of Annual Compensation. Therefore, its figure for the average Annual Compensation of Dieter's five highest years is $269,882, fifty percent of which is slightly less than $135,000. Thus, Fidelcor has been paying Dieter $135,000 pursuant to the minimum amount set forth in section 6(ii).

The trial court found, and both parties agreed, that the terms of the Agreement were unambiguous. Therefore, the terms are to be construed by the court as a matter of law. *Community College v. Society of the Faculty*, 473 Pa. 576, 592, 375 A.2d 1267, 1275 (1977); *Marcinak v. S.E. Greene School District*, 375 Pa.Super. 486, 490–92, 544 A.2d 1025, 1027 (1988). In so doing, a court must be guided by the paramount goal of contract interpretation: "to ascertain and give effect to the parties' intent." *Laudig v. Laudig*, 425 Pa.Super. 228, 233, 624 A.2d 651, 653 (1993); *Archer v. State Farm Insurance Co.*, 419 Pa.Super. 558, 564–65, 615 A.2d 779, 783 (1992), *alloc. denied*, 535 Pa. 612, 629 A.2d 1375 (1992). This intent must be ascertained from the language of the written agreement. *Stewart v. McChesney*, 498 Pa. 45, 48–51, 444 A.2d 659, 661–62 (1982); *Archer*, 419 Pa.Super. at 564–65, 615 A.2d at 783; *Warren v. Greenfield*, 407 Pa.Super. 600, 605–07, 595 A.2d 1308, 1311 (1991). "In the absence of technical terminology, we give the words used in the agreement their plain and ordinary meaning." *Id.*

Dieter's appeal centers around the meaning of the term "Annual Compensation" as used in section 6 of the Agreement. Section 6 states that retirement benefits will be calculated based on the executive's Annual Compensation, including salary, bonuses, and incentive compensation. It is true, as Dieter asserts, that the use of the term "including"

1. The parties do not dispute that Dieter's five highest earning years are 1984–1988.

does not limit Annual Compensation to the three listed types of income. Any additional types, however, must still be Annual Compensation, as salary, bonuses, and incentive compensation are parenthetical modifiers of Annual Compensation.

The act of granting stock options could fall within this provision, as it is arguably both annual and compensatory. Since the primary purpose of stock option grants is to compensate employees, these non-cash grants do come under a fair and normal definition of the term "compensation." Furthermore, options are granted on an annual basis. Therefore, notwithstanding valuation problems, it is at least arguable that the granting of stock options is Annual Compensation within the meaning of this section. As persuasive as this argument is, however, it is irrelevant to our inquiry because Dieter is not asserting that the **stock options** are Annual Compensation. Instead, Dieter is arguing that the **income realized from the exercise of the stock options in later years** is Annual Compensation.[2]

In contrast to the annual nature of the grant of a stock option, the exercise of a stock option can occur at any future time, at the sole discretion of the employee. Even if the exercise of the option and the resulting transfer of stock from employer to employee is an act of compensation, there is nothing annual about it. An employee may exercise his or her options annually, or may save them and exercise them all at once in some future year. As the trial court notes, "the issuance of an unvalued right, which may be exercised and converted into stock at any number of years following its issuance, is diametrically opposed to the term 'Annual.'" Opinion 2/17/94 at 11. Given the sporadic and unpredictable nature of the act of exercising stock options, it would require a very strained reading of the term "Annual" to fit the exercise of stock options within this clause.

---

2. It appears that most of Dieter's stock options were actually granted in years prior to 1984, so they would have little impact on his retirement benefits. *See* Opinion 2/17/94 at 6. This fact explains why Dieter wishes to focus on the exercise of the stock options, which primarily occurred between 1984 and 1988.

In addition to the non-annual nature of the act of exercising stock options, Dieter's interpretation of Annual Compensation would produce a completely unreasonable result. If Dieter's reading of this clause prevailed, he could unilaterally manipulate the amount of his retirement benefits. Dieter could hold his options, wait for stock prices to soar, and exercise the options all at once. Thus, the company would be forced to include, as part of Dieter's Annual Compensation, all of the profit accrued since the date of the actual stock option grant.

The inequity of this result is illustrated by analogizing to a scheme where Fidelcor gives Dieter actual shares of stock, rather than stock options. If these shares are to be deemed annual compensation, they would have to be valued in the year they are granted, rather than several years later when they are sold at a profit. It is unreasonable to assume that the company would agree to such a radical formula that gives an employee this much control without any specific discussion in the Agreement.[3]

Dieter attempts to bolster his position by pointing to the fact that the income derived from the exercise of the stock options is treated as compensation for tax purposes. As the trial court noted, however, the issue in this case is the parties' intent, which is determined by the law of contracts, and not by tax law. Opinion 2/17/94 at 5.

Dieter also asserts that retirement agreements must be construed in favor of the employee and against the employer/drafter. As a general rule, agreements will be construed against the drafter when terms are ambiguous. *E.g., Raiken v. Mellon*, 399 Pa.Super. 192, 196–98, 582 A.2d 11, 13 (1990). When terms are clear and unambiguous, however, courts must adhere to the written language of the agreement. *Id.* We find that the term "Annual Compensation" is sufficiently clear and unambiguous that the court need not resort to cannons of

**3.** If the parties truly intended to include income from the exercise of stock options in the calculation of retirement benefits, it would have been a very simple matter to add a specific reference to this type of income in the benefit calculation formula.

interpretation, such as construing the Agreement against the drafter.

Even if we were to assume that there was another reasonable interpretation of Annual Compensation, we would not automatically construe this Agreement against Fidelcor. While the rule that agreements are to be construed against the employer may be true in cases of general retirement plans that are presented to employees on a take-it or leave-it basis, it is not necessarily the case when the employee is in a position to negotiate for his or her benefits. *Cf. Levitt v. Billy Penn Corp.*, 219 Pa.Super. 499, 283 A.2d 873 (1971) (construing a retirement agreement against the employer and emphasizing that the agreement was presented to the employees on a take-it or leave-it basis).

In the present case, Dieter negotiated his employment contract at a time when he had a great deal of bargaining power. Dieter was the President and Chief Operating Officer of a target company. Since a merger is much easier when target management is cooperative, it was in Fidelcor's interests to make certain concessions to Dieter. In this situation, we cannot assume that Dieter was presented a standard take-it or leave-it contract. It is more appropriate in this instance to presume that the parties bargained from positions of relatively equal strength, and to construe the contract accordingly.

Lastly, Dieter asserts certain procedural deficiencies in Fidelcor's summary judgment motion. We agree with the trial court that Dieter waived these arguments by failing to raise them prior to his statement of matters complained of on appeal. *See* Pa.R.A.P. 302(a); Opinion 2/17/94 at 4.

Since we agree that the language of this Agreement was unambiguous, and that Fidelcor's reading of the term "Annual Compensation" is more consistent with the parties' manifested intent, we find that the trial court properly entered summary judgment against Dieter.

Order affirmed.