IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Devereux Foundation,                      :
                              Appellant   :
                                          :
            v.                            :
                                          :
Chester County Intermediate Unit          :   No. 698 C.D. 2014
No. 24                                    :   Submitted: November 6, 2015


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
PRESIDENT JUDGE PELLEGRINI                    FILED: December 3, 2015


            The Devereux Foundation (Foundation) appeals from an order of the
Court of Common Pleas of Chester County (trial court), dismissing its breach of
contract action against Chester County Intermediate Unit No. 24 (Intermediate Unit
or CCIU) with regard to a series of contracts the Foundation and the Intermediate
Unit entered into for the provision of special-education services. For the reasons that
follow, we affirm.


**I.**

            This matter is presently before us for the second time. In *Devereux
Foundation v. Chester County Intermediate Unit No. 24* (Pa. Cmwlth., No. 698 C.D.

2014, filed May 8, 2015) (*Devereux I*),[1] the Foundation asserted that the Intermediate Unit breached certain Standard Education Agreements (Agreements) into which the parties entered, providing that the Intermediate Unit would pay a set, daily fee to the Foundation with regard to each child referred there, in exchange for the Foundation's provision of educational services.[2]

Following the execution of the Agreements, in 2000, the parties also entered into a separate agreement (Fee Agreement) stating as follows:

> Agreement between Devereux and Chester County Intermediate Unit ("the parties") relative to Educational Services provided by Devereux to students evaluated by the CCIU under separate contractual arrangements by the parties:
>
> 1. Beginning with services provided in the 00–01 school year, CCIU will collect fees equal to five percent (5%) of each amount collected from student's [*sic*] home or host school districts. Based upon expected total annual billings of $500,000 to $600,000, this fee is projected to be $25,000 to $30,000 assuming collection for all services.

---

[1] Because the facts of this case are set forth at length in our opinion in *Devereux I*, we will dispense with a full recitation here.

[2] The Foundation is a national organization that provides residential treatment services to children at its facilities in West Chester, Great Valley, Tredyffrin/Easttown and Downingtown School Districts (Host Districts). The Host Districts delegated their educational responsibilities under Section 1372(4) of the Public School Code of 1949 (Code) to the Intermediate Unit which, in turn, contracted with the Foundation to fulfill the children's educational needs. Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §13-1372(4). The Host Districts also delegated to the Intermediate Unit the following responsibilities: "identification of special needs children" and "administration of billing and reimbursement functions." (Reproduced Record [R.R.] at 1401a.)

2. Fee is to be deducted by the CCIU upon remittance of collected tuitions to Devereux. Such remittance must take place within seven (7) business days of the date CCIU receives funds from the student's home or host school district.

3. CCIU is to provide Devereux with a monthly status of all outstanding amounts under this agreement, including: Information relative to dates documentation was sent to and received from the home/host school districts, dates services were billed by the CCIU, dates of follow up with key contacts at those districts, etc.

4. Agreement is to remain in place for one school year, although either party can terminate it without cause after providing sixty (60) days written notice to the other party. At the end of the school year, performance will be evaluated by the parties and a determination will be made whether or not to continue the Agreement. If there is no significant improvement in the collection time for these services, the percentage fee will be adjusted downward in the subsequent school year. Current Devereux experience indicates the average collection period for these services is nine (9) to twelve (12) months from the date services are rendered.

5. CCIU and Devereux management will meet no less than quarterly to address issues that arise relative to this agreement, to ensure activities are coordinated properly, and evaluate performance of the parties. These meetings will not be deemed to replace any routine communications necessary to facilitate day-to-day operations under the existing contract between the parties.

6. Bills from Devereux to CCIU and, in turn, from CCIU to home/host school districts, will be done on a monthly basis.

(Reproduced Record [R.R.] at 1515a.)

While the Intermediate Unit remitted all monies it collected from the students' districts of residence (Home Districts), less its permitted administrative fee, it was unwilling to pay for special-education services rendered by the Foundation for which it had been unable to collect payment from the Home Districts.[3] As such, the Foundation filed a breach of contract action against the Intermediate Unit averring that: (1) the Intermediate Unit's obligation to remit payment to the Foundation was not contingent upon its receipt of payment from the Home Districts and, therefore, the Intermediate Unit was liable for the shortfall; and (2) the Intermediate Unit breached the Agreements by failing to provide the Home Districts with documentation necessary to secure the Home Districts' approval of the invoices and, therefore, the Intermediate Unit was liable for the deficit.

---

[3] The Host Districts are entitled to collect from students' Home Districts "a special education charge in addition to the applicable tuition charge" when special-education services are rendered. Section 1309(a)(2) of the Code, 24 P.S. §13-1309(a)(2). Further, Section 1308(b) of the Code provides:

> In the event that the district in which the institution is located contracts with a third party to provide educational services to children who are inmates of the institution, the third party may seek payment of tuition directly from the district of residence. The third party shall notify the district in which the institution is located of its payment request to the district of residence, and, if the district of residence makes payment to the third party, the third party shall notify the district in which the institution is located. Such payment to the third party shall satisfy and extinguish the contractual payment obligation of the district in which the institution is located. The district so charged with tuition by the third party may file an appeal with the secretary as set forth in subsection (a).

24 P.S. §13-1308(b).

In *Devereux I,* we upheld the trial court's determination that under the plain language of the Agreements, the Intermediate Unit's obligation to remit payment to the Foundation was conditioned upon the Intermediate Unit's receipt of monies from the Home Districts pursuant to the Agreements' "pay-if-paid" clauses and, therefore, we affirmed judgment entered in the Intermediate Unit's favor in this regard. However, we remanded the case to the trial court to issue a supplemental opinion addressing the Foundation's second claim, namely, that the Intermediate Unit failed to provide the Home Districts' parental signatures on individualized education programs (IEPs), Notice of Recommended Educational Placements (NOREPs), and other parental consent forms which must be obtained in order to evaluate a child, thereby resulting in the Home Districts' refusal to pay special-education rates.[4]

## II.

On remand, the trial court determined that the Foundation failed to satisfy its burden of proof regarding its second claim because it did not establish the existence of specific contract provisions requiring the Intermediate Unit to secure the

---

[4] To qualify for special-education services, a child must be evaluated to determine if he has an intellectual disability, health impairment or specific learning disability that requires special education. 22 Pa. Code §14.123. Before an initial evaluation may be conducted, parental consent generally must be obtained on a permission to evaluate (PTE) form. 34 C.F.R. §300.300(a)(1)(i)–(iii). Following administration of the assessments and other evaluation measures, an IEP team determines whether a child has a qualifying disability. 34 C.F.R. §300.306(a)(1). A copy of the evaluation report (ER) and supporting documentation must be provided to the child's parent. 34 C.F.R. §300.306(a)(2). If a child is determined to have a disability, an IEP must be developed and parental notice and consent must be provided via a NOREP before the IEP is implemented. *See* 34 C.F.R. §300.300(b); 34 C.F.R. §300.320(a). While IEPs were already in effect for some children before they were referred to the Foundation, this appeal, like the prior one, concerns the children who did not yet have IEPs and, therefore, did not yet qualify for special-education services at the time they enrolled at the Foundation.

subject signatures or to comply with a particular process in seeking reimbursement from the Home Districts, and that the Foundation failed to demonstrate a breach of those terms. In reaching this conclusion, the trial court relied on paragraphs 13–21 of the parties' stipulated facts, stating as follows:

13. In the context of this litigation, [the Intermediate Unit] dealt with hundreds of children who were placed at [the Foundation].

14. Most of the children that [the Intermediate Unit] dealt with were residents of the School District of Philadelphia ("SDP").

15. In many instances, [the Intermediate Unit] sought educational records and information from PSD [*sic*] for the children as such records and information were necessary to provide the children with educational services. PSD [*sic*] did not provide the records at all and/or it was difficult or impossible for [the Intermediate Unit] to obtain the records from PSD [*sic*].

16. In carrying out the Child Find Function and other such tasks on behalf of the Host School Districts, [the Intermediate Unit] in many instances encountered families in crisis due to causes such as mental illness, drug abuse, and incarceration.

17. Those circumstances presented obstacles to [the Intermediate Unit] in meeting with, communicating with, and obtaining signatures from parents/guardians on NOREPs, IEPs, and other forms.

18. [The Intermediate Unit] took steps to contact the parents/guardians of the children being placed in [the Foundation].

19. [The Intermediate Unit] staff attempted to contact the parents by repeated efforts using the telephone, email,

letters, and meeting parents at [the Foundation] facilities when parents were there.

20. There were multiple [Intermediate Unit] coordinators, administrative staff and even director level employees working together to reach parents/guardians that needed to be reached so that among other things, NOREPs, IEPs and other documentation could be completed and signed.

21. For a period of several years, [the Intermediate Unit] hired a private detective to find parents/guardians. Among the reasons for doing this was to obtain signatures of parents/guardians on NOREPs and other educational documents.

(R.R. at 1401a–1402a.)

The trial court noted that as per the stipulation, facts were presented "which demonstrate that [the Intermediate Unit] did fulfill whatever obligations it might have had to pursue payment from the Home School Districts." (7/29/15 Supplemental Opinion, at 2.) This appeal followed.

## III.

On appeal,[5] the Foundation contends that the trial court erred in determining that neither the Agreements nor the Fee Agreement imposed a duty on the Intermediate Unit to furnish executed IEPs, NOREPs or other parental consent forms. In construing these written agreements, we must seek to give effect to the

---

[5] Whether a trial court has correctly interpreted a writing in ascertaining the legal duties arising from it is a question of law which this Court reviews for legal error. *Downingtown Area School District v. International Fidelity Insurance Co.*, 769 A.2d 560, 565 n.9 (Pa. Cmwlth.), *appeal denied*, 786 A.2d 991 (Pa. 2001).

parties' intent: "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." *Lesko v. Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (internal citation and quotation marks omitted). Accordingly, when a contract's language is clear and unambiguous, its meaning is determined from "the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).

## A.

First, the Foundation claims that the Intermediate Unit is in "breach of its express contracts," because it assumed the duty imposed upon the Host Districts to obtain parental signatures for the special-education services pursuant to Section 1306 of the School Code, 24 P.S. § 13-1306. (Supplemental Appellant's Br., at 8.) Conversely, the Intermediate Unit argues that the Agreements do not confer upon it the duty to secure IEPs, NOREPs or parental signatures under the penalty of paying the shortfall. We agree with the Intermediate Unit.

It is clear from the pleadings and from the Foundation's own admission that its second claim pertains to a breach of contract action against the Intermediate Unit and not an action for the Intermediate Unit's alleged statutory violation. A review of the Foundation's amended complaint belies its argument that its claim is premised upon a statutory duty. Indeed, the amended complaint avers that "Pursuant to its *express agreements with* [*The Foundation*] and the directives of the Director of the Pennsylvania Bureau of Special Education, the [Intermediate Unit] had a duty to obtain all required signatures on either the 'final' IEP or parental signatures on…[the

8

NOREP] form with respect to all children receiving special education services at [The Foundation]." (R.R. at 429a.)

Despite this allegation, the Foundation does not point to any such express provision, and this Court could identify no contract provision in the Agreements rendering the Intermediate Unit responsible for obtaining executed IEPs or NOREP forms. Putting aside the fact that the Foundation has not pointed to any provision in the School Code authorizing a private cause of action for damages, under the express language of the contract, the only duties imposed upon the Intermediate Unit pertain to payment for services the Foundation rendered, its duty to remove clients in the event of a contract termination, indemnification, and the maintenance of confidential client information. Further, the Agreements make clear that their text "constitutes the entire understanding between the parties as to the matters contained herein and there are no terms, covenants, conditions, representations, warranties or agreements expressed or implied, oral or written of any nature whatsoever other than as herein contained." (R.R. at 1785a.)

Nonetheless, the Foundation attempts to rely on a 1998 letter from Great Valley School District's Superintendent, Rita S. Jones, Ed. D., to the Intermediate Unit's Executive Director, Dr. John Baillie, in which the Home District "is requesting that [the Intermediate Unit] act on [its] behalf to provide diagnostic evaluations, special education programming and related services to specified children who are identified and reside for non-educational reasons in a private institution within [its] district." (R.R. at 1466a.) This letter, however, offers no support for the Foundation's argument as it does not, in any way, alter the contract provisions

9

governing the Foundation's relationship with the Intermediate Unit. Even assuming that the Intermediate Unit granted this request and entered a contract with the Great Valley School District to that extent, the Foundation has not argued that it has a right to enforce the contract between the Home Districts and the Intermediate Unit, such that it would have standing to pursue a breach of contract action against the Intermediate Unit for failing to satisfy duties not enumerated in the subject Agreements.

## B.

Alternatively, the Foundation contends that "the many contracts and agreements between the parties demonstrate that the [Intermediate Unit] was obligated to carry out and complete the Child Find function by, *inter alia*, obtaining parental consent, as a prerequisite to payment by the Home Districts." (Supplemental Appellant's Br., at 20.) In support of this proposition, the Foundation cites the Agreements' first and third whereas clauses, providing:

> **Whereas**, [the Intermediate Unit] has determined that [the Foundation] is able to meet the special educational needs of individuals for which [the Intermediate Unit] is obligated to provide services/funding, and
>
> * * *
>
> **Whereas**, [the Intermediate Unit] represents that the parent(s) or guardian of the Client has agreed that [the Foundation] is able to meet the needs of the client….

(R.R. at 1784a.)   In this way, the Foundation argues that the Intermediate Unit breached the subject contract by making a misrepresentation that it had already obtained the necessary parental approvals.

Nothing in the contract supports this interpretation.  The language relied upon by the Foundation does not discuss any form of parental approvals, and the fact that the Intermediate Unit has deemed the Foundation able to meet the students' educational needs is separate and apart from the obligation to secure parental approvals for performing evaluations and developing IEPs.   Moreover, if the Foundation alleges that the Intermediate Unit made a misrepresentation in the contract, it should have pursued an action for misrepresentation rather than for breach of contract.[6]   Regardless, the Intermediate Unit's assertion that "the parent(s) or guardian of the Client has agreed that [the Foundation] is able to meet the needs of the client" is not the equivalent of an assertion that the Intermediate Unit secured the necessary parental approvals, in writing, before entering into the Agreement, particularly where the Agreement cautions that no implied representations, conditions or agreements arise from it, other than those expressly contained.

---

[6] *Compare Liss & Marion, P.C. v. Recordex Acquisition Corp.* 983 A.2d 652, 665 (Pa. 2009) (stating that to succeed in a breach of contract action, a plaintiff must demonstrate that:  (1) a contract existed; (2) the defendant breached the contract; and; (3) the breach caused the plaintiff damages) *with Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) ("The elements of intentional misrepresentation are as follows:  (1) A representation; (2) which is material to the transaction at hand (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.")

Still, the Foundation asserts that the Fee Agreement "made clear that the [Intermediate Unit] was expected to generate approximately $25,000–$30,000 per year 'assuming collection for all services,'" and that the Intermediate Unit could not do so without obtaining the requisite parental signatures. (Supplemental Appellant's Br., at 21.) Therefore, the Foundation argues that to give effect to this provision, we must infer the Intermediate Unit's duty to furnish completed documentation to the Home Districts.

A review of the Fee Agreement undermines this argument. While the Fee Agreement did provide for a five-percent (5%) collection fee, based upon a presumed collection of $500,000 to $600,000 per year, resulting in a "*projected*" rate of "$25,000 to $30,000 assuming collection for all services," it contemplated a course of action if collection rates were lower. (R.R. at 1515a.) First, the Intermediate Unit's collection fee, based upon a percentage of the monies it collected, obviously dropped. Additionally, the Fee Agreement provided that at the end of each school year, the Intermediate Unit's collection time would be evaluated, and if "significant improvement" did not result, its five-percent (5%) collection fee would be adjusted downward. Under no circumstances did the Fee Agreement provide that the Intermediate Unit was obligated to pay the deficit for uncollectible bills, nor did it obligate the Intermediate Unit to obtain the requisite parental consents. Rather, the Fee Agreement merely governed the logistics of fee collection and remittance.

12

## C.

Next, the Foundation alleges that the Intermediate Unit breached its duty
of good faith and fair dealing and the doctrine of necessary implication[7] by failing to

<hr>

[7] While the Foundation uses the phrases "duty of good faith and fair dealing" and "doctrine of necessary implication" interchangeably, these terms are not synonymous. The former imposes upon each party to a contract the duty to act honestly in carrying out the express contract provisions. *See* Restatement (Second) of Contracts §205 (1981); *see also* Section 1201 of the Uniform Commercial Code, *as amended*, 13 Pa. C.S. §1201; *Department of Transportation v. E-Z Parks, Inc.*, 620 A.2d 713, 717 (Pa. Cmwlth.), *appeal denied*, 627 A.2d 181 (Pa. 1993). As discussed in *E-Z Parks, Inc.*:

> Pennsylvania courts have recognized a separate duty of good faith performance of contracts only in limited circumstances. This duty of good faith is limited to situations where there is some special relationship between the parties, such as a confidential or fiduciary relationship. A confidential relationship exists when one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other. A business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other.

620 A.2d at 717 (internal citations and quotation marks omitted).

The doctrine of necessary implication differs:

> [i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose of the contract and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. The doctrine of necessary implication may be applied only in limited circumstances to prevent injustice where it is abundantly clear that the parties intended to be bound by the terms sought to be implied.

*Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 868 (Pa. Cmwlth. 2001) (internal citations and quotation marks omitted), *appeal denied*, 796 A.2d 319 (Pa. 2002).

provide the Home Districts with the necessary documentation. Even assuming that the good faith and fair dealing argument has not been waived,[8] it fails because the Foundation has not shown that the duty applies in this context or that the Intermediate Unit breached such a duty.

Specifically, the Foundation's argument that it shared a confidential or fiduciary relationship with the Intermediate Unit simply because the Intermediate Unit "contracted with [the Foundation] to provide special education services which the [Intermediate Unit] was statutorily obligated to provide under Section 1306, and because the [Intermediate Unit] specifically agreed, in a separate contract, to collect fees for such services from the Home Districts" is insufficient to establish a confidential or fiduciary relationship. (Supplemental Appellant's Br., at 27.) By this standard, any parties to a contract share a confidential or fiduciary relationship.

Moreover, based on the parties' stipulation, it is clear that the Foundation did satisfy the duty of good faith and fair dealing by: requesting educational records and information from the Philadelphia School District; attempting to meet, communicate with and obtain the requisite signatures from parents and guardians; making repeated efforts to reach parents and guardians via

---

[8] Contrary to the Intermediate Unit's assertion, the Foundation raised its duty of good faith and fair dealing argument in its post-trial motion filed with the trial court. However, it did not raise the issue regarding the doctrine of necessary implication at the trial court level and, therefore, that argument is waived. *See* Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *City of Philadelphia v. Fraternal Order of Police Lodge No. 5*, 677 A.2d 1319, 1323 (Pa. Cmwlth.) (*en banc*) ("A well-established rule in this Commonwealth is that issues not raised in the court below are waived and may not be raised for the first time on appeal."), *appeal withdrawn*, 682 A.2d 312 (Pa. 1996).

telephone, email and letters; meeting parents at the Foundation facilities; and even hiring a private investigator to locate parents and guardians. The fact that the Philadelphia School District did not provide the records or that parents or guardians could not be reached despite numerous attempts at contact is not indicative of the Intermediate Unit's bad faith in executing its contract obligations.

**D.**

Finally, in challenging the trial court's conclusion that the Intermediate Unit satisfied its contractual duties, the Foundation characterizes the trial court's decision as "concluding that the [Intermediate Unit]'s performance of its contractual duties was impossible, as demonstrated by the efforts it undertook without success and, therefore, was excused from performance." (Supplemental Appellant's Br., at 30.) In this respect, the Foundation claims that the Intermediate Unit never pled impossibility of defense or an affirmative defense in its new matter and, thus, waived the issue. Conversely, the Intermediate Unit urges us to find this issue waived because the Foundation did not assert it before the trial court and did not include it in its statement of errors complained of on appeal.

We must reject the Intermediate Unit's argument. While this issue was raised for the first time in the Foundation's supplemental brief before this Court, it had no opportunity to raise it previously. Indeed, following *Devereux I*, we remanded the matter to the trial court to issue a supplementary opinion regarding the Foundation's second breach of contract claim. It was not until the trial court rendered its opinion that the Foundation could identify the basis for the trial court's ruling, and by that juncture, its statement of errors complained of on appeal had already been

15

filed. Therefore, the Foundation's only opportunity to challenge the trial court's ruling in this respect was in its supplemental appellate brief.

Nonetheless, we find this issue without merit insofar as the Foundation mischaracterizes the trial court's opinion. The trial court did not determine that the Intermediate Unit's efforts were sufficient *because* requiring strict compliance with the contract terms would be impossible. Rather, the trial court ruled that the Intermediate Unit satisfied the only requirements imposed by the Agreements to pursue collections from the Home Districts without regard to the difficulty of actually obtaining payment. Any discussion regarding the difficulty of collecting the requisite signatures was germane to the Foundation's good faith argument, not its claim regarding the breach of express contract provisions.

Accordingly, because the trial court did not err in determining that the Foundation failed to satisfy its burden of showing that the subject Agreements imposed a duty upon the Intermediate Unit to furnish completed IEPs, NOREPs or other documentation containing parental signatures, that it had a confidential or fiduciary relationship with the Intermediate Unit subjecting it to the duty of good faith and fair dealing, or that the Intermediate Unit acted without good faith, we affirm the trial court's order entering judgment for the Intermediate Unit.

_____
DAN PELLEGRINI, President Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Devereux Foundation,    :
      Appellant :
         :
    v.      :
         :
Chester County Intermediate Unit :
No. 24       : No. 698 C.D. 2014

## **O R D E R**

AND NOW, this 3rd day of December, 2015, the order of the Court of Common Pleas of Chester County in the above-captioned matter is hereby affirmed.

_____
DAN PELLEGRINI, President Judge